### 41065. IN RE L. H. R.
(321 SE2d 716)

CLARKE, Justice.

This appeal from an order of the Superior Court of DeKalb County poses a question of first impression. Stated simply the question is under what circumstances may life-support systems be removed from a terminally ill patient existing in a chronic vegetative state with no hope of development of cognitive function.

L. H. R. suffered a "medical catastrophe" fifteen days after her normal birth in October 1983. She remained in a local hospital until January 29, 1984, when she was transferred to Henrietta Egleston Hospital for Children and placed under the care of a pediatric neurologist. The neurologist determined that the infant was in a "chronic vegetative state" with "absence of cognitive function." Eighty-five to ninety percent of her brain tissue had been destroyed, and her condition was described as "irreversible," with no hope of recovery.

The neurologist, the infant's parents, and the guardian ad litem appointed for the child all agreed that she should be removed from life-support systems. An ad hoc Infant Care Review Committee convened by the hospital to review the case concurred. This committee consisted of two pediatricians, a registered nurse, a social worker, the hospital administrator, and the parent of a handicapped child. Egleston filed a petition for declaratory relief on February 8. On February 9, after a hearing in DeKalb Superior Court, the hospital and physicians were enjoined from interfering with the constitutional and common law rights of the child and from interfering with the wishes of L. H. R.'s parents and guardian to have life-support systems removed. After entry of this order·the life-support systems were removed, and the child died within thirty minutes.

The trial court sua sponte added the Attorney General as a party to the suit and directed that he prosecute an appeal. The primary purpose for the appeal is to afford this court an opportunity to set forth guidelines for the future handling of this type situation. The questions for decision are who may make treatment decisions and

whether judicial intervention is required. This appeal is not moot inasmuch as this case is among those cases which are "capable of repetition yet evading review." Gerstein v. Pugh, 420 U. S. 103 (95 SC 854, 43 LE2d 54) (1975).

We begin our discussion of treatment decisions for incompetent persons with In re Quinlan, 355 A2d 647 (N.J. 1976), cert. denied, 429 U. S. 922, the seminal case in this area. The New Jersey Supreme Court in In re Quinlan considered the petition of the father of a comatose adult that the court order the hospital and physician to terminate the life-support system. The court began its analysis by finding that the right to refuse medical treatment is a constitutional right based on the individual's right to privacy. The individual who is incompetent does not lose this right because of incompetency. Id. at 664. The question to be decided, therefore, was who might exercise this right on behalf of the incompetent. The court found that the right of Karen to refuse medical treatment could be exercised by her guardian (her father) and family after obtaining the opinion of the attending physician that there was no reasonable possibility of Karen's emerging from a comatose state to a cognitive state. Upon deciding that there was no hope of recovery, the attending physician would consult with a hospital ethics committee, and upon the concurrence of that body in the prognosis, the life-support system might be withdrawn.

The court in In re Quinlan found judicial intervention generally inappropriate: "We consider that a practice of applying to a court to confirm such decisions would generally be inappropriate, not only because that would be a gratuitous encroachment upon the medical profession's field of competence, but because it would be impossibly cumbersome." Id. at 669.

Similarly, in John F. Kennedy Memorial Hosp. v. Bludworth, 452 S2d 921 (Fla. 1984), and In re Barry, 445 S2d 365 (Fla. App. 2d Dist. 1984), Florida courts have found judicial intervention unnecessary. In re Barry involved a fact pattern particularly close to that of the present case. The natural parents of a 10-month-old terminally ill comatose child petitioned as legal guardians of the child to have life-support systems removed. The state contended that the lower court erred in permitting removal of the life-support system because the state's interest in preserving life outweighed the parents' assertion of the child's right of privacy. The state also contended that the court erred in basing its order on the doctrine of substituted judgment in the absence of evidence of the infant's intention. The appellate court found that the doctrine of substituted judgment as developed in order to afford incompetent persons the same right as competent individuals to refuse medical treatment. Under the doctrine of substituted judgment the decisionmaker bases the decision on what he believes the

patient, if competent, would have done. While this analysis is useful in the case of adults, it is difficult to apply in the case of young children. The court found ". . . in the case of a child who has not reached maturity, it is the parents and their medical advisors who generally must make these decisions. And, where judicial intervention becomes necessary or desirable, the court must be guided primarily by the judgment of the parents who are responsible for their child's well-being, provided, of course, that their judgment is supported by competent medical evidence." Id. at 371. Given the evidence of the child's condition, the court concluded, "We can conceive of no state interest great enough to compel the parents to continue to submit their child to a life support system in this instance. To do so would merely prolong the death of a child terminally ill, wholly lacking in cognitive brain functioning, completely unaware of his surroundings, and with no hope of development of any awareness. . . . It is, we think, the right and obligation of the parents in such an instance to exercise their responsibility and prerogative, as did Mr. and Mrs. Barry, of making an informed determination as to whether these extraordinary measures should be continued." Id.

In conclusion, the court addressed the state's contention that judicial intervention should be required in these cases. The court, observing that the issue was not squarely before it, found, "A decision by parents supported by competent medical advice that their young child suffers from a permanent, incurable and irreversible physical or mental defect likely to soon result in the child's death should ordinarily be sufficient without court approval. Of course, diagnosis should always be confirmed by at least two physicians. We must remember that the conscience of society in these matters is not something relegated to the exclusive jurisdiction of the court." Id. at 372. See also In re Colyer, 660 P2d 738 (Wash. 1983), in which the court found that judicial intervention is rarely required. The Colyer court did note, however, that in the case of an incompetent adult such as Colyer, the appointment of a guardian gave the court some limited degree of supervision. In a similar vein, the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research in its 1983 publication *Deciding to Forego Life-Sustaining Treatment*, said, "The Commission concludes that ordinarily a patient's surrogate — whether designated through judicial proceedings or informally — should have the legal authority to make decisions on behalf of an incapacitated patient." Id. at 154.

A different view is found in the holding of the Supreme Judicial Court of Massachusetts in Superintendent of Belchertown State School v. Saikewicz, 370 NE2d 417 (Mass. 1977), which has generally been interpreted as providing that the question of the giving or withholding of life-prolonging treatment from incompetents must in all

instances be presented to the probate court for hearing. Since there was also provision for appointment in most cases of a guardian who would be charged with presentation of all arguments in favor of treatment, the hearing contemplated would be adversarial in nature. This holding has provoked voluminous comment from the medical and legal communities and from members of other disciplines.

Noting the formation of ethics committees by many health care institutions and observing that these committees might make a valuable contribution to the probate judge in these deliberations, the court concluded, "[w]e take a dim view of any attempt to shift the ultimate decision-making responsibility away from the duly established courts of proper jurisdiction to any committee, panel or group, ad hoc or permanent." Id. at 434. Finally the court concluded, "We do not view the judicial resolution of this most difficult and awesome question — whether potentially life-prolonging treatment should be withheld from a person incapable of making his own decision — as constituting a 'gratuitous encroachment' on the domain of medical expertise. Rather, such questions of life and death seem to us to require the process of detached but passionate investigation and decision that forms the ideal on which the judicial branch of government was created. Achieving this ideal is our responsibility and that of the lower court, and is not to be entrusted to any other group purporting to represent the 'morality and conscience of our society,' no matter how highly motivated or impressively constituted." Id. at 435.

The outcry was immediate and vociferous. William J. Curran, in "The Saikewicz Decision," Law-Medicine Notes, 298 New England Journal of Medicine 499 (March 2, 1978), praised the opinion as an example of enlightened jurisprudence down to that portion which dealt with the procedures for decisionmaking as to the giving or withholding of life-prolonging treatment. Curran found that the requirement of what amounts to an adversary hearing and a judicial decision in every case showed a distrust and lack of understanding of medical care procedures. He voiced particular concern about the delay which would result from court procedures and appointing of guardians ad litem and made the important point that delays do not assure a status quo. There is no assurance that the condition of the patient remains stable while the decision is made. In fact, the decision to delay may be a passive decision as to treatment.

In "The Saikewicz Decision: Judges As Physicians," 298 New England Journal of Medicine 508 (March 2, 1978), Arnold S. Relman, M.D., Editor of the New England Journal of Medicine and Professor of Medicine at Harvard, said: "This astonishing opinion can only be viewed as a resounding vote of 'no confidence' in the ability of physicians and families to act in the best interests of the incapable patient suffering from a terminal illness. The latter's constitutional right to

refuse or accept medical therapy under such circumstances, a right that the court clearly recognized, is to be entrusted to no one but the courts." Id. Dr. Relman invited judges who feel the judiciary should routinely assume responsibility for life and death matters to take a tour of an acute-care hospital ". . . where they can take sober cognizance of the numbers of urgent and complex medical problems that would have to be adjudicated in their courts." Id. at 509.

During 1978, at the invitation of the editors of the American Journal of Law and Medicine, professionals from four different fields critiqued the Saikewicz opinion. Dr. Relman reiterated his opinion that the attending physicians and the family, following concurrence in the diagnosis by physician with no stake in the outcome, should make medical treatment decisions involving life and death of incompetent persons. Relman found judicial intervention necessary only in the event of disagreement between decisionmakers. He criticized the Saikewicz decision as ". . . a new intrusion of the judiciary into the area of medical practice previously considered the private domain of physicians, patients, and their families." Relman, A., "The Saikewicz Decision: A Medical Viewpoint," 4 American Journal of Law & Medicine, 233, 237 (1978).

Charles H. Baron, Professor of Law at Boston College Law School, responded with "Medical Paternalism and the Rule of Law: A Reply to Dr. Relman," 4 American Journal of Law & Medicine, 337 (1978). Professor Baron challenged Dr. Relman's attack on Saikewicz as an example of outmoded medical paternalism. He favored judicial intervention as the only mechanism for guaranteeing due process to the incompetent patient.

In "Reconciling Quinlan and Saikewicz: Decision Making for the Terminally Ill Incompetent," 4 American Journal of Law & Medicine 367 (1978), George J. Annas, Associate Professor of Law and Medicine, Boston University School of Medicine, argued that the cases are compatible. Both courts found that physicians should make medical judgments while societal judgments belong in the courts. The primary difference between the cases, according to Annas, is that Quinlan defined a legally acceptable standard which physicians can apply whereas Saikewicz defined a legal standard for decisionmaking which only courts can apply. Id. at 371. In Quinlan the medical prognosis was the key to the unfettered right to refuse treatment. Saikewicz, on the other hand, was much more complex, involving withholding life-prolonging treatment, chemotherapy, from a mentally retarded person with leukemia. Although the patient, a sixty-seven-year-old man, had an I.Q. of ten, he enjoyed good health aside from the leukemia and was physically strong and ambulatory. The question was whether the doubtful benefits of the treatment outweighed the pain and confusion which it would cause in the patient.

Annas severely criticized both the medical profession and the legal profession for the severe reaction following Saikewicz. He cited the defibrillation of a dying woman seventy times in a twenty-four-hour period and plans to implant a pacemaker in a brain-dead individual, both on advice of hospital counsel, as examples of the hysterical reaction to Saikewicz.

A final contributor to the discussion on Saikewicz in the American Journal of Law & Medicine was Allen Buchanan, an Associate Professor of Philosophy at the University of Minnesota. In "Medical Paternalism or Legal Imperialism: Not the Only Alternatives for Handling Saikewicz-type Cases," 5 American Journal of Law & Medicine 97 (1979), Buchanan charged that the three other writers ignored the family's special moral relationship with the incompetent patient. Buchanan's approach was based on three propositions: (1) The proper presumption in a Saikewicz-type case is that the incompetent's family will make treatment decisions; (2) this presumption is defeasible if vigorous discussion and accountability through impartial review show the family's decision to be indefensible; (3) the proper institutional framework for implementing the other two propositions is an ethics committee.

Buchanan's ethics committee is neither an all-medical prognosis committee nor an administrative agency of the hospital, but a committee made up of a wide range of individuals. The committee would not decide individual cases but would develop guidelines and procedures for decisionmaking by physicians and families. The committee would review the decisions made and in extreme cases seek legal intervention. While the family would have access to the committee for advice, the committee's main function, review, would occur after the decisionmaking, thus eliminating the delay inevitable in prior judicial approval. Although the guidelines developed by the committee would be primarily procedural, the basic substantive standard for decisionmaking would be that the decisionmaker determine what he would wish done were he the incompetent. In cases where this standard could not be applied, the best interest test would be used. Buchanan concluded, "Perhaps the strongest argument against abdicating to either medical professionals or legal professionals our moral responsibility is the fact that with regard to Saikewicz, various representatives of both groups seem so absorbed in their respective visions of professional expertise that they have been unable even to entertain the possibility of a third alternative." Id. at 117.

As the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research noted in *Deciding to Forego Life-Sustaining Treatment*, given the fact that it has been possible for some years to keep unconscious patients alive for long periods of time, it is remarkable that most of the issues concern-

ing decisionmaking were not addressed by the courts until In re Quinlan. The reason is, of course, that such decisions were routinely made prior to 1975 by physicians and families without judicial review.

The issue of care for the hopelessly or terminally ill patient presents almost infinite variables constantly increasing in number and complexity as science and technology push back the threshold of knowledge. Advances in this area are occurring with such rapidity that science has outstripped the ability of society to develop an ethical base for dealing with problems caused by new possibilities. In the case before us, the patient was an infant who, so far as we can know, never had an opportunity to develop ideas and certainly never had an opportunity to express ideas. The condition of the infant was such that she was terminally and hopelessly ill, and there was no reasonable possibility that she would ever attain cognitive function. Under these circumstances, we find that the life-support system was prolonging her death rather than her life.

We do not consider here the issue of initiation of treatment rather than its termination, the initiation or ceasation of treatment for a terminally ill but cognitive child or adult, or any of the other numerous issues which could arise and no doubt will arise in connection with the treatment of hopelessly or terminally ill patients. We deal only with the termination of treatment of the terminally ill patient, adult or child, in a chronic vegetative state for whom there is no reasonable possibility of attaining (or regaining) cognitive function.

In any discussion of who will exercise the incompetent patient's constitutional right to refuse treatment, we must recognize the importance of the family in our society. This recognition is particularly crucial when the patient is a child. "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More importantly, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." Parham v. J. R., 442 U. S. 584, 602 (99 SC 2493, 61 LE2d 101) (1979). See also Wisconsin v. Yoder, 406 U. S. 205 (92 SC 1526, 32 LE2d 15) (1972); Prince v. Massachusetts, 321 U. S. 158 (64 SC 438, 88 LE 645) (1944); Pierce v. Society of Sisters, 268 U. S. 510 (45 SC 571, 69 LE 1070) (1925). The right of the parent to speak for the minor child is so imbedded in our tradition and common law that it has been suggested that the constitution requires that the state respect the parent's decision in some areas. See Parham v. J. R., supra, concurring opinion of Justice Stewart.

In a case of suspected neglect or abuse or when the parent assumes a stance which in any way endangers the child, the parent's right to speak for the child may be lost. But the beginning presumption is that the parent has the child's best interest at heart.

In Georgia, as elsewhere, a competent adult patient has the right to refuse medical treatment in the absence of conflicting state interest. *Jefferson v. Griffin Spalding County Hosp. Auth.*, 247 Ga. 86 (274 SE2d 457) (1981) (concurring opinion); *Kirby v. Spivey*, 167 Ga. App. 751 (307 SE2d 538) (1983). Very recently the General Assembly has provided that a competent adult may make a "living will" to instruct his physician to withhold or withdraw life-sustaining procedures in the event of a terminal condition. OCGA § 31-32-1 et seq., Ga. L. 1984, p. 1477. We now hold that this right rises to the level of a constitutional right which is not lost because of the incompetence or youth of the patient. The narrow question remaining in the case before us is who may exercise this right on behalf of a terminally ill infant who is in a chronic vegetative state with no reasonable possibility of attaining cognitive function. We conclude that the right to refuse treatment or indeed to terminate treatment may be exercised by the parents or legal guardian of the infant after diagnosis that the infant is terminally ill with no hope of recovery and that the infant exists in a chronic vegetative state with no reasonable possibility of attaining cognitive function. The above diagnosis and prognosis must be made by the attending physician. Two physicians with no interest in the outcome of the case must concur in the diagnosis and prognosis. Although prior judicial approval is not required, the courts remain available in the event of disagreement between the parties, any case of suspected abuse, or other appropriate instances.

In the narrow case before us no hospital ethics committee need be consulted. This in no way forecloses use of such a committee if this is the choice of the hospital, physician or family. Once the diagnosis is made that the infant is terminally ill with no hope of recovery and in a chronic vegetative state with no reasonable possibility of attaining cognitive function, the state has no compelling interest in maintaining life. The decision to forego or terminate life-support measures is, at this point, simply a decision that the dying process will not be artificially extended. While the state has an interest in the prolongation of life, the state has no interest in the prolongation of dying, and although there is a moral and ethical decision to be made to end the process, that decision can be made only by the surrogate of the infant. Since the parents are the natural guardians of the infant, where there are parents no legal guardian and no guardian ad litem need be appointed.

We conclude that the decision whether to end the dying process is a personal decision for family members or those who bear a legal responsibility for the patient. We do not consider this conclusion an abdication of responsibility by the judiciary. While the courts are always available to protect the rights of the individual, the condition of this individual is such that the decision is one to be made by the fam-

ily and the medical community. As previously noted, the courts remain open to assist if there is disagreement between decisionmakers or question of abuse.

We do not address the question of the necessity for the appointment of an ethics committee or prior judicial approval in cases in which the issue is life-prolonging rather than death-prolonging treatment for incompetent patients.

Since we find that there is no legal difference between the situations of infant and the incompetent adult who has made no living will, we will take this opportunity to extend our holding to such an incompetent adult patient. In the case of incompetent adults who are terminally ill, in a chronic vegetative state with no reasonable possibility of regaining cognitive function, we find that the family of the adult or the legal guardian may make the decision to terminate life-support systems without prior judicial approval or consultation of an ethics committee.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 16, 1984 —
REHEARING DENIED OCTOBER 29, 1984.

*Michael J. Bowers, Attorney General, David C. Will, Assistant Attorney General,* for appellant.

*Warner, Mayoue & Wilgus, C. Wilbur Warner, Jr., John C. Mayoue, King & Spalding, Joseph R. Bankoff, J. Kevin Buster, Jane E. Jordan, Doster, Allen & King, Simuel F. Doster, Jr., F. Carlton King, Jr.,* for appellee.

*Alston & Bird, Jack Spalding Schroder, Jr., Scott R. Owens, Gary R. Franklin, Powell, Goldstein, Frazer & Murphy, Richard H. Vincent, Robert N. Berg, John V. Costley, Jr., Fenella Rouse, Stuart, Zavin, Sinnreich & Wasserman, Richard Wasserman,* amici curiae.