## A95A1552. VELEZ v. BETHUNE et al.

(466 SE2d 627)

McMurray, Presiding Judge.

Plaintiff Sherry S. Bethune, individually, as mother of Mary Elizabeth Bethune, a deceased minor, and as temporary administratrix of the child's estate, brought this intentional tort[1] action against defendant Francisco J. Velez, M. D., and others, seeking to recover for the alleged wrongful death of the nine-day-old infant. Mary Elizabeth Bethune was born prematurely "on the side of the expressway . . ." on November 20, 1991, after a gestation period of approximately 24 weeks, and was immediately taken to Southern Regional Medical Center. Defendant first saw the infant on November 28, 1991. Due to severe prematurity, the infant "was unstable with a chest [X]-ray that shows evidence of interstitial pulmonary emphysema, and . . . metabolic acidosis." According to the amended complaint, on November 29, 1991, Dr. Velez unlawfully, intentionally, and without justification, abandoned his patient, the infant Mary Elizabeth Bethune, by causing the "termination[, deescalation,] and discontinuance of cardio pulmonary resuscitation, life support measures and medical treatment for her," without the consent and approval of the infant's parents, and without their knowledge.

Dr. Velez denied the material allegations, although he subsequently deposed that he "ordered discontinuation of an on-going resuscitation." After a period of discovery, defendant moved for summary judgment on the grounds that he had obtained the consent of the parents to stop treatment and that the child was already "clinically dead" by the time he disconnected ongoing life support measures. In support of the contention that he obtained the consent of the parents, defendant relied on his progress notes made by him on November 29, 1991, which recite, in part: "After discussing condition with parents and agreement with them we decided that it was in the best interest of this patient to stop any further resuscitative effort." This meant that Dr. Velez "stopped the infusion of Dopamine, and we stopped mechanical ventilation."

Plaintiff opposed the motion with the affidavit of the infant's father, Clayton E. Bethune, who deposed that he "never discussed with [defendant] any efforts by him to stop resuscitation efforts for my daughter[; and further that he had] never given permission to [defendant] to stop resuscitation efforts on Mary Elizabeth Bethune." The affidavit of Delaine Brown, plaintiff's cousin, contradicts defendant's contention that he spoke with plaintiff and obtained her permission to stop resuscitative efforts on November 29, 1991. "In the pres-

---

[1] A separate count for medical malpractice was dismissed for failure to file the affidavit of an expert, as mandated by OCGA § 9-11-9.1.

ence of [plaintiff], I observed Mary Elizabeth Bethune on November 29, 1991. When I first saw Mary Elizabeth Bethune, she was [already] dead, was not clothed in any way and was not attached to any life support systems." Also, medical records indicate that the infant still had a heartbeat at 8:30 a.m., i.e., although, in the death certificate he signed, Dr. Velez had pronounced the infant dead at 7:50 a.m. Defendant also testified variously that the infant was in the process of dying at 7:50 a.m., which necessarily "means that the baby is still alive[.]"

The trial court denied defendant's motion for summary judgment but certified its order denying reconsideration for immediate review. Defendant's application for interlocutory appeal was granted and a timely notice of appeal was filed. *Held*:

1. In four related enumerations, defendant enumerates the denial of his motion for summary judgment. He argues first that the act of removing infant Bethune from life support is not a tort for which plaintiff can recover. We disagree.

The allegations were sufficient to state a wrongful death claim on the basis that the infant's death resulted either from defendant's reckless disregard of the consequences, or his heedless indifference to the rights and safety of others. When coupled with a reasonable foresight that injury would probably result, this constitutes that criminal negligence equivalent to an intentional tort. *Hamilton v. Powell, Goldstein &c.*, 252 Ga. 149, 150 (311 SE2d 818). See also *Bowers v. State*, 177 Ga. App. 36, 38 (338 SE2d 457). In the case sub judice, Dr. Velez had no right to decide, unilaterally, to discontinue medical treatment even if, as the record in this case reflects, the child was terminally ill and in the process of dying. That decision must be made with the consent of the parents. See *In re Jane Doe*, 262 Ga. 389, 391 (2), 393 (2) (c) (418 SE2d 3).

2. Next, defendant contends that the denial of summary judgment was erroneous because the infant Bethune was clinically dead. We do not agree that the absence of legal injury to the tragically premature infant nor the absence of proximate cause has been established beyond question. The evidence is in conflict as to whether the defendant physician, Francisco J. Velez, M. D., reasonably believed that he acted with the informed consent of the parents when he intentionally discontinued resuscitative efforts and intentionally removed life support mechanisms. See *In re Jane Doe*, 262 Ga. 389, 391 (2), 393 (2) (c), supra. The evidence is also in conflict as to whether the infant was clinically dead at the time. Although the trier of fact could conclude that Dr. Velez was entirely justified in his actions, within the meaning of OCGA § 51-11-1, the question of reasonableness remains for the jury to determine under all the attendant circumstances, including the credibility of the witnesses. The case law

regarding the negligent failure to diagnose a terminal disease is simply inapposite to the deliberate acts of withholding or deescalating medical assistance, and the dissents err in relying thereon. Furthermore, the imminence and inevitability of death for this nine-day-old infant go only to the quantum of damages and do not vitiate the doctor's initial dereliction, if the jury finds one. See, e.g., *In re Jane Doe*, 262 Ga. 389, 391 (2), fn. 4, supra. It is our view that, the trial court correctly denied defendant's motion for summary judgment in this instance.

3. Defendant's two remaining enumerations have been considered and are found to be without merit.

*Judgment affirmed. Pope, P. J., Johnson, Blackburn and Ruffin, JJ., concur. Beasley, C. J., and Blackburn, J., concur specially. Birdsong, P. J., Andrews and Smith, JJ., dissent.*

BEASLEY, Chief Judge, concurring specially.

I agree with the majority because Dr. Velez had no right to discontinue treatment without the parents' consent. The obligation is enunciated by the Georgia Supreme Court in *In re L. H. R.*, 253 Ga. 439 (321 SE2d 716) (1984), which recognized a duty. Following that decision, the legislature delineated certain rights and obligations with respect to the question of cardiopulmonary resuscitation, in OCGA § 31-39-1 et seq. See *In re Jane Doe*, 262 Ga. 389, 391 (2) (418 SE2d 3) (1992).

Since the constitutional right to refuse belonged to the child, and had to be exercised by her surrogates (her parents) following the diagnosis and prognosis not only of the attending physician but also that of another, disinterested, physician, OCGA § 31-39-2, discontinuance without consent could be either an intentional or a negligent act, depending on the facts found by the jury. In either event, it would be an "unlawful violation of a private legal right," OCGA § 51-1-1. The law always seeks to give a remedy if a legal right has been violated. See Ga. Law of Damages (4th ed.), §§ 1-1, 1-4. If the failure to get consent carries no legal liability, then the protective scheme created in *In re L. H. R.*, supra at 446, and refined by the statute is unenforceable.

The fact that there may be little or no actual damages does not govern whether there is a compensable tort. Nominal damages would be sufficient. See measure of damages, OCGA § 51-12-4. *Bradley v. Godwin*, 152 Ga. App. 782, 784 (3) (264 SE2d 262) (1979).

In my opinion, the wrongful death statute includes the wrongful *hastening* of death, and there is some evidence that the infant's earlier death was caused by Dr. Velez. The record does not preclude a finding that his actions caused the death to be sooner rather than later, and that before he took these actions he did not get the consent of the surrogates of the person whose life was thereby terminated.

BLACKBURN, Judge, concurring specially.

I agree with the majority; I write separately to specifically address *Dowling v. Lopez*, 211 Ga. App. 578, 579 (440 SE2d 205) (1993) cited by Judge Andrews' dissent. Although I agree with Judge McMurray that *Dowling* is factually distinguishable from the present case, I am compelled to raise the same concern here that I raised in my dissent in *Dowling*.

Judge Andrews would find that because Dr. Velez, at most, only shortened the life of a terminally ill child, no damages for the wrongful death of the child are available to the plaintiffs. It is undisputed in this case that the *immediate* cause of the child's death was the actions of Dr. Velez. The child was connected to a mechanical ventilator that Dr. Velez caused to be turned off. While it may well be true that the child would probably have ultimately succumbed to her illness, which had been diagnosed as terminal, no one can state with certainty that death would have in fact resulted from her condition. In any event, a jury would be authorized to find that the child would have lived longer but for the actions of Dr. Velez and that the immediate cause of the child's death was the intentional wrongful act of Dr. Velez. As the majority found, the child's condition and life expectancy would be factors for the jury to consider in its assessment of damages if it otherwise found defendant liable for the child's death.

ANDREWS, Judge, dissenting.

Sherry Bethune, as the mother of the deceased child and as the temporary administratrix of the child's estate, sued Dr. Velez for damages after her child died nine days after birth while under the care of Dr. Velez at the Southern Regional Medical Center (the hospital) in Clayton County.

Ms. Bethune alleged that Dr. Velez improperly discontinued ongoing resuscitative efforts, life support procedures and medical treatment which were being employed to keep the prematurely born child alive and that this action caused or contributed to the death of the child. This appeal is from the trial court's order denying Dr. Velez's motion to dismiss and his alternative motion for summary judgment.

This is not a medical malpractice action. Although Ms. Bethune alleged malpractice in her original complaint, she voluntarily dismissed the portion of her complaint alleging that Dr. Velez negligently failed to comply with the appropriate standard of medical care. The only expert medical evidence in the case was given by Dr. Velez, who stated by affidavit and deposition that he acted in an ordinarily skillful manner within the appropriate standard of medical care when he determined that it was medically appropriate to disconnect the mechanical ventilator from the child and discontinue other resuscita-

tive measures and medical treatment. Ms. Bethune contends, not that Dr. Velez was professionally negligent, but that he took these actions improperly without the consent of the child's parents.

The record shows that the child was prematurely born on November 20, 1991 outside the hospital after a gestation period of approximately 24 weeks. The premature child was delivered by the father on the side of an expressway as the parents were on their way to the hospital. The child was admitted to the hospital emergency room on November 20 shortly after birth weighing approximately 500 grams and suffering from "profound hypothermia." After resuscitation efforts were successful in the emergency room, the child was transferred to the neonatal intensive care unit for further treatment, which included mechanical ventilation. Dr. Velez testified that on November 29, 1991, while he was the treating physician for the child, the child was listed in critical condition, that he discussed with the parents that the child was on "ventilatory support, high doses of [an] inotropic agent and had received several doses of sodium bicarb and epinephrine" and was "not responding to my resuscitative efforts." He testified that, after discussing the child's condition with both parents, he obtained their oral consent to discontinue any further resuscitative efforts "due to a poor prognosis consistent with severe prematurity." Dr. Velez testified that discontinuation of resuscitation efforts "means that we stopped the infusion of Dopamine, and we stopped mechanical ventilation." Both parents denied that they had any such discussion with Dr. Velez, and both parents stated that they did not consent to the discontinuation of any medical treatment on the child.

As to the medical status of the child when Dr. Velez discontinued medical treatment and ordered the child disconnected from the mechanical ventilator, the hospital records showed that Dr. Velez pronounced the child dead at 7:50 a.m. on November 29, 1991. However, the records also show that the mechanical ventilator was not disconnected from the child until 8:30 a.m. on the same morning. Although Dr. Velez contended in one portion of his deposition that the child was "clinically dead" when he took these actions, he testified in another portion of his deposition that the child "was in the process of dying" at 7:50 a.m. and was "still alive" when resuscitation efforts were discontinued and the mechanical ventilator was disconnected. Hospital records of the child's monitored heart rate, blood pressure and temperature provided evidence that the child was registering vital signs when resuscitative measures were discontinued and the ventilator was disconnected.

After voluntarily dismissing the medical malpractice portion of her complaint (Count 2), only Count 1 of the complaint remained. In Count 1, Ms. Bethune alleged that, without the consent of the child's parents, Dr. Velez "caused the issuance of an order not to continue

the resuscitation of [the child] in violation of OCGA Section 31-39-1, et seq." which in turn caused the death of the child. Under OCGA § 31-39-1 et seq., except as otherwise permitted by court order, where a minor child is a proper "candidate for nonresuscitation" as defined by OCGA § 31-39-2 (4), an attending physician must obtain the consent of the parents before issuing an order not to attempt cardiopulmonary resuscitation of the child. Ms. Bethune alleged in Count 1 that, as a result of the alleged unauthorized action taken by Dr. Velez, she was entitled to recover for the full value of the child's life as the mother of the child and that, as the temporary administratrix of the child's estate, she was entitled to recover for funeral, medical and other expenses and for the pain and suffering of the deceased child. Dr. Velez moved the court for summary judgment as to Count 1.

Subsequently, Ms. Bethune amended her complaint to add two additional counts denominated as Counts 3 and 4. In Count 3, Ms. Bethune alleged that the actions taken by Dr. Velez intentionally caused or contributed to the child's death and that Dr. Velez abandoned the child in a condition that resulted in the child's death. She further alleged in Count 3 that, as the mother of the child, she is entitled to recover for the full value of the life of the child and that, as the temporary administratrix of the child's estate, she is entitled to recover for funeral, medical and other expenses and for the child's pain and suffering. Count 4 of the complaint alleged that Dr. Velez is liable for punitive damages as a result of his actions.

After Counts 3 and 4 were added, the trial court ruled on Dr. Velez's motion for summary judgment as to Count 1. The trial court granted summary judgment in favor of Dr. Velez as to Count 1, ruling that there was no evidence in the record that a "do not resuscitate" order was ever issued by Dr. Velez or anyone else caring for the child, and that OCGA § 31-39-1 et seq. did not apply. The trial court concluded that, as the record stands, there is no evidence that this case involved a do not resuscitate order under which extreme lifesaving procedures would have been withheld if the child suffered cardiac or respiratory failure. Accordingly, the court concluded that OCGA § 31-39-1 et seq. governing the issuance of orders not to attempt cardiopulmonary resuscitation to reverse sudden, unexpected death did not apply. Rather, the trial court concluded that a decision was made in this case to discontinue or deescalate ongoing medical treatment. See *In re Jane Doe*, 262 Ga. 389, 390, n. 1 (418 SE2d 3) (1992) (distinguishing between a do not resuscitate order and a decision to deescalate ongoing medical treatment). No direct appeal was taken from the grant of summary judgment as to Count 1, nor has this issue been raised by cross-appeal in the present action.

Subsequently, Dr. Velez moved for dismissal or alternatively for

summary judgment as to Counts 3 and 4. Dr. Velez contended in part that Ms. Bethune attempted in these counts to reassert a medical malpractice action without filing the expert affidavit required by OCGA § 9-11-9.1. The trial court ruled that Counts 3 and 4 did not claim medical malpractice but rather alleged that Dr. Velez was liable for an intentional tort, so no expert affidavit was required. Ms. Bethune concedes on appeal that the complaint does not set forth a claim for medical malpractice. Accordingly, the trial court correctly held that the complaint does not allege medical malpractice. Citing *In re L. H. R.*, 253 Ga. 439 (321 SE2d 716) (1984), and *In re Jane Doe*, supra, the trial court concluded that Counts 3 and 4 set forth a viable cause of action against Dr. Velez, not for medical malpractice, but for terminating medical treatment for the child without the consent of the parents, which constituted an intentional tort. The trial court's denial of the motions as to Counts 3 and 4 is the subject of the present appeal.

Count 3 of the complaint sets forth two separate causes of action. One cause of action alleges a wrongful death claim in which Ms. Bethune seeks to recover for the full value of the child's life in her capacity as the child's mother. See OCGA § 51-4-1 et seq. In a separate cause of action in Count 3, Ms. Bethune seeks to recover "funeral, medical and other expenses resulting from the death of [the child] . . . and for the pain and suffering of [the child]" in her capacity as the personal representative of the child's estate. OCGA §§ 9-2-41; 51-4-5 (b); *Smith v. Mem. Med. Ctr.*, 208 Ga. App. 26, 27 (430 SE2d 57) (1993).

Recovery under Georgia's wrongful death statutes is limited to "all cases in which the death of a human being results from a crime, from criminal or other negligence, or from property which has been defectively manufactured, whether or not as the result of negligence." OCGA § 51-4-1 (2); *Ryals v. Billy Poppell, Inc.*, 192 Ga. App. 787 (386 SE2d 513) (1989). Obviously, this case does not involve defectively manufactured property, nor is there any allegation of professional negligence. Accordingly, by statutory definition, the alleged wrongful death in this case must have resulted from either a crime or criminal or other negligence not constituting professional negligence.

I agree with the majority that the allegations of the complaint were sufficient to state a wrongful death claim on the basis that the child's death resulted from criminally negligent conduct equivalent to an intentional tort. Either a reckless disregard of the consequences or heedless indifference to the rights and safety of others, coupled with reasonable foresight that injury would probably result, constitutes criminal negligence equivalent to an intentional tort. *Bowers v. State*, 177 Ga. App. 36, 38 (338 SE2d 457) (1985); *Hamilton v. Powell, Goldstein &c.*, 252 Ga. 149, 150 (311 SE2d 818) (1984).

The majority also correctly concludes that Dr. Velez had no right to unilaterally decide to discontinue medical treatment even if, as the record in this case reflects, the child was terminally ill and in the process of dying. Under *In re L. H. R.*, supra, the parents of the infant child were authorized to consent on behalf of the child to refuse or terminate medical treatment only "after diagnosis that the [child] is terminally ill with no hope of recovery and that the [child] exists in a chronic vegetative state with no reasonable possibility of attaining cognitive function. The above diagnosis and prognosis must be made by the attending physician. Two physicians with no interest in the outcome of the case must concur in the diagnosis and prognosis." Id. at 446. Once such a diagnosis and prognosis is made and is concurred in by two other physicians, "the state has no compelling interest in maintaining life [and] [t]he decision to forego or terminate life-support measures is, at this point, simply a decision that the dying process will not be artificially extended." Id. at 446. Under these circumstances, it is the decision of the parents as to whether or not to end the dying process for their infant child. Id. at 446.

The record is not clear as to whether the circumstances existed which would have authorized the parents in this case to consent to discontinuation of life support measures on the child. Nevertheless, the trial court correctly concluded that a question of fact existed as to whether the parents consented to the actions taken by Dr. Velez. Under the contradictory testimony rule, the trial court was also authorized to construe Dr. Velez's various statements regarding the time of the child's death as contradictory testimony which created a factual issue as to whether or not the child was still alive when he discontinued medical treatment and life support measures. *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680) (1986).

But even assuming the child was alive at that time and that Dr. Velez acted without the authorized consent of the parents, the trial court erred by denying summary judgment on the wrongful death claim because there was no evidence in this case that the discontinuation of medical treatment and life support measures was the proximate cause of the child's death within the meaning of the Georgia wrongful death statutes. "Georgia's wrongful death statutes give a right of action not available at common law and must be limited strictly to the meaning of the language employed and not extended beyond plain and explicit terms. *Miles v. Ashland Chem. Co.*, 261 Ga. 726, 728 (410 SE2d 290) [(1991)]." *Dowling v. Lopez*, 211 Ga. App. 578, 579 (440 SE2d 205) (1993).

The gravamen of the present wrongful death action is not that Dr. Velez negligently diagnosed the child's condition as terminal, but that he wrongfully discontinued medical treatment for the child without the authorized consent of the parents. Ms. Bethune does not con-

tend that Dr. Velez was professionally negligent, and the only medical testimony in the case is Dr. Velez's opinion that the child was either "clinically dead" or in "the process of dying" because of medical problems caused by severe prematurity and would not have survived despite the discontinuation of medical treatment. Given the undisputed medical evidence, the wrongful death claim in this case is clearly not that the child would have lived but for the actions of Dr. Velez, but that the life of the terminally ill child may have been prolonged for a short period. Although Ms. Bethune may have sought damages in a cause of action outside of Georgia's wrongful death statutes,[2] the wrongful death statutes are strictly construed to provide for recovery for the full value of the decedent's life in cases where death resulted from the defendant's alleged wrongful act — they do not provide for recovery in this type of case, where the child's death was the unavoidable result of other causes, and the defendant's actions only hastened the already inevitable death. See OCGA § 51-4-1 (2); *Dowling*, supra; Annotation: Recovery in Death Action for Failure to Diagnose Incurable Disease Which Caused Death, 64 ALR4th 1232. Accordingly, the trial court erred in denying summary judgment on the wrongful death claim because "there is no evidence that defendant's [discontinuation of medical treatment] was the proximate cause of the decedent's death so as to authorize damages for the full value of the decedent's life pursuant to OCGA § 51-4-2 (a)." *Dowling*, supra at 581.

The majority refuses to apply the holding of *Dowling*, supra, to the facts of this case, concluding that a factual question remains as to whether the actions taken by Dr. Velez were the proximate cause of the infant's death, and that the "imminence and inevitability of death for this nine-day-old infant go only to the quantum of damages. . . ." This is the same argument which was rejected by a majority of this Court in *Dowling*. See id. at 582-583 (Blackburn, J., dissenting). In *Dowling*, the plaintiff sought to recover for the wrongful death of the decedent claiming that, even though the decedent had terminal cancer and would have died within a few years, the defendant's negligent misdiagnosis caused the decedent to die sooner. The majority in *Dowling* concluded that there was no evidence of proximate cause and that a wrongful death action could not be sustained on a claim that "there is evidence that the decedent's life could have been prolonged (rather than saved) had it not been for defendant's alleged malpractice." Id. at 580. In reaching this conclusion, the majority rejected the dissent's assertion that "[t]he existence of the terminal condition

---

[2] Although a violation of the parents' right to consent to withdrawal of medical treatment may possibly have supported a claim for intentional infliction of emotional distress, this cause of action was not alleged.

would be a factor in calculating damages, but it would not preclude a wrongful death action." Id. at 583 (Blackburn, J., dissenting). There is simply no basis for distinguishing the terminal condition of the decedent in *Dowling* from the terminal condition of the deceased infant in this case. If there was no proximate cause in *Dowling*, there is no proximate cause here. If *Dowling* is no longer to be followed, it should be forthrightly overruled.

In the second cause of action in Count 3, Ms. Bethune, as the administrator of the estate, sets forth claims for funeral, medical and other necessary expenses resulting from the death of the child and for the child's pain and suffering. See OCGA §§ 51-4-5 (b) and 9-2-41. These are claims which the administrator has the right to pursue, which existed in the child before death, and which the child would have been entitled to pursue had she lived. *Gay v. Piggly Wiggly Southern*, 183 Ga. App. 175, 180 (358 SE2d 468) (1987); *Complete Auto Transit v. Floyd*, 214 Ga. 232, 237-238 (104 SE2d 208) (1958). As such, the medical expenses are sought as "an item of special damage incident to the recovery for the injury to the person [of the deceased]" and funeral expenses are sought as expenses resulting from the wrongful death of the deceased. *Gay*, supra at 180. The claim for pain and suffering in this case constitutes a claim that, had the child lived, the child would have had a cause of action for pain and suffering resulting from Dr. Velez's discontinuation of medical treatment. *Floyd*, supra at 237. Furthermore, since the punitive damages sought in Count 4 pursuant to OCGA § 51-12-5.1 are not available in the wrongful death claim, they constituted a pre-death tort claim of the decedent brought by the administrator of the estate for punitive damages "in connection with the injuries [and] pain and suffering of the deceased . . ." as a result of Dr. Velez's discontinuation of medical treatment. *Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331, 340-341 (319 SE2d 470) (1984).[3]

There is no evidence to support a recovery on these claims. As to the claim that funeral expenses resulted from the wrongful death of the deceased, in the absence of a viable wrongful death claim there is no basis for recovery of resulting funeral expenses. As to the claim for medical expenses incurred by the child, there is no evidence that any action taken by Dr. Velez caused additional medical expenses.

As to the pain and suffering claim, the allegation against Dr. Velez was not that he injured the child and caused the child to experience pain and suffering by taking some action below the standard of medical care, but rather that he withdrew medical treatment without

---

[3] Count 4 of the complaint did not allege a separate cause of action but simply alleged that the plaintiffs were entitled to recover punitive damages.

proper authorization. There is no claim in this case that Dr. Velez's discontinuation of medical treatment for the child constituted professional negligence, and the only expert medical testimony was that the treatment provided by Dr. Velez was within the appropriate standard of care. As discussed in relation to the wrongful death claim, this amounts to a claim that Dr. Velez's unauthorized actions deprived a terminally ill child of a chance to survive for a short period of time. There is no evidence that any action taken by Dr. Velez caused the child additional pain and suffering. Similarly, in the absence of any basis for concluding that Dr. Velez took actions which caused the child to experience pain and suffering, there is no support for the recovery of punitive damages in connection with any injuries or pain and suffering. See *Donson Nursing Facilities v. Dixon*, 176 Ga. App. 700, 702 (337 SE2d 351) (1985); *Jones v. Davis*, 183 Ga. App. 401, 403 (359 SE2d 187) (1987).

Accordingly, the trial court erred by denying summary judgment in favor of Dr. Velez as to Counts 3 and 4 of the complaint.

I am authorized to state that Presiding Judge Birdsong and Judge Smith join in this dissent.

SMITH, Judge, dissenting.

A physician's failure to obtain appropriate consent before discontinuing resuscitative efforts is reprehensible and actionable through a claim for medical malpractice. Plaintiff initially pursued such a claim but later chose to dismiss it. A *wrongful death* action will not lie, however, because the facts and issues involved in this case are controlled by *Dowling v. Lopez*, 211 Ga. App. 578 (440 SE2d 205) (1993), authored by the author of the majority in this case. The language in *Dowling* is unequivocal: "Neither [the wrongful death statute], nor any other provision in Georgia's wrongful death statutes provides for recovery where a defendant's *wrongful act* or negligence did not result in death." (Emphasis supplied.) Id. at 579-580. In this case, plaintiffs failed to point to evidence that defendant's intentional acts proximately caused the child's death, or evidence "showing to any reasonable degree of medical certainty that the patient's death could have been avoided." Id. at 580.

Strangely, *Dowling* seems to have been ignored by the majority, even though the author of the majority also authored *Dowling*. Apparently, the majority attempts to distinguish *Dowling* by characterizing the doctor's acts here as intentional. In truth, the facts in *Dowling* came far closer to establishing the existence of proximate cause than those in this case.[4] A wrongful death action nonetheless was not

---

[4] Plaintiffs have pointed to no evidence that the life of the child would have been substantially prolonged. There was testimony that the premature child was "clinically dead" or

viable there. A reading of the precise language in *Dowling* shows that any distinction between intentional and negligent acts is immaterial. Simply characterizing the doctor's act as an intentional tort is not enough to transform the action into a viable one for wrongful death.

To allow the wrongful death action to proceed ignores and implicitly overrules the plain language of *Dowling*. I agree with Judge Andrews that *Dowling* "should be forthrightly overruled" if that case is no longer the law. The trial court erred in denying summary judgment to defendant.

I am authorized to state that Presiding Judge Birdsong and Judge Andrews join in this dissent.

DECIDED DECEMBER 5, 1995 —
RECONSIDERATION DENIED DECEMBER 20, 1995.

*Sullivan, Hall, Booth & Smith, John E. Hall, Jr., T. Andrew Graham,* for appellant.

*George H. Connell, Jr.,* for appellees.

---

"was in the process of dying" when resuscitation efforts were discontinued. In *Dowling*, which involved the negligent failure to diagnose cancer, a surgeon testified that he had treated patients with symptoms similar to those of the decedent who had lived for six to eight years, and even longer. Id. at 580. This Court nevertheless found that no evidence existed that the misdiagnosis proximately caused decedent's death so as to authorize damages under the wrongful death statute. Id. at 581.