A08A1669. PRUETTE v. PHOEBE PUTNEY MEMORIAL HOSPITAL.
A08A1670. UNGARINO v. PRUETTE.
(671 SE2d 844)

BERNES, Judge.

This is a wrongful death action alleging medical negligence brought by the plaintiff for the death of her mother, who allegedly died as the result of receiving an overdose of morphine ordered by Dr. Thomas Ungarino and administered by a nurse employed by Phoebe Putney Memorial Hospital. Dr. Ungarino and Phoebe Putney moved for summary judgment on the ground that the uncontroverted evidence showed the morphine did not proximately cause the mother's death. The trial court denied summary judgment to Dr. Ungarino but granted it to Phoebe Putney. In so ruling, the trial court concluded sua sponte that the nurse's alleged negligence was not imputable to Phoebe Putney because she was the borrowed servant of Dr. Ungarino. For the following reasons, we affirm the denial of summary judgment to Dr. Ungarino but reverse the grant of summary judgment to Phoebe Putney.

Summary judgment is proper if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). On appeal from a trial court's grant or denial of a motion for summary judgment, we review the evidence de novo, with all reasonable inferences construed in the light most favorable to the nonmoving party. *McCaskill v. Carillo*, 263 Ga. App. 890 (589 SE2d 582) (2003).

So viewed, the record reflects that the decedent, Jamie Louis Vinson, was 79 years old at the time of her death. In the final years of her life, Ms. Vinson suffered from end-stage chronic obstructive pulmonary disease ("COPD"), a lung disorder that resulted in airway obstruction and difficulty breathing. She had been hospitalized several times for complications relating to her COPD. During one prior hospitalization, Ms. Vinson had been intubated and placed on mechanical ventilation; based on that experience, she informed her family and doctors that she did not wish to be intubated again if she went into respiratory arrest.

On March 7, 2002, Ms. Vinson experienced progressively worse shortness of breath and was taken by ambulance to Phoebe Putney, where she was diagnosed with pneumonia and admitted for treatment. After several days in the hospital, her condition began to improve. On the morning of March 18, however, Ms. Vinson's condition significantly worsened and she went into respiratory arrest.

Linda Hurdle, the registered nurse assigned to care for Ms. Vinson, called an emergency code. Among other members of the hospital staff who responded was Dr. Ungarino, a pulmonary critical care physician. Dr. Ungarino had never seen Ms. Vinson before as a patient and had never been consulted about her treatment or care during her hospitalization. Dr. Ungarino took charge of the resuscitation efforts. As a result of those efforts, Ms. Vinson began breathing again on her own, although she continued to suffer from severe dyspnea, or "air hunger." Dr. Ungarino began preparing to intubate Ms. Vinson so that she could be placed on a mechanical ventilator. As Dr. Ungarino made these preparations, Dr. Kay Kitchen, Ms. Vinson's attending physician,[1] entered the hospital room. Dr. Kitchen immediately told Dr. Ungarino to stop his preparations because Ms. Vinson did not wish to be intubated. Dr. Ungarino stopped as requested and left the room.

While the emergency resuscitation efforts had restarted Ms. Vinson's breathing, Dr. Kitchen believed that without intubation, Ms. Vinson's chance of survival was almost none. Dr. Kitchen communicated her prognosis to plaintiff Jeri Pruette, Ms. Vinson's daughter and healthcare power of attorney, who agreed that no additional life-saving measures (including CPR) should be administered if Ms. Vinson coded again that day. After consulting with Ms. Vinson's treating pulmonologist, Dr. Jyotir Mehta,[2] Dr. Kitchen

---

[1] Ms. Vinson was the longstanding patient of Albany Internal Medicine. Dr. Kitchen was a physician with that practice group and in that capacity was Ms. Vinson's attending physician on the date of her death.

[2] Dr. Mehta was Ms. Vinson's treating pulmonologist who had seen her on several

informed plaintiff that she planned to order that Ms. Vinson receive two milligrams of morphine, every thirty minutes to one hour as needed, for pain, distress, and shortness of breath. Dr. Kitchen then gave her order for two milligrams of morphine to Nurse Hurdle, who recorded the order on Ms. Vinson's chart.

Five minutes later, Dr. Ungarino, who was still outside the hospital room, wrote an order in Ms. Vinson's chart for a single dose of 20 milligrams of morphine to be administered "IV push," that is, by "rapid infusion." The order for twenty milligrams was written beneath Dr. Kitchen's order for two milligrams of morphine. Dr. Ungarino did not speak with Ms. Vinson's family or consult with Dr. Kitchen or Dr. Mehta before writing the order.

According to plaintiff, Ms. Vinson began showing signs of improvement shortly after the administration of the code, despite her poor prognosis. Ms. Vinson sat up in bed, said hello to her granddaughter who had come into the room, and began talking with plaintiff about her favorite television show.[3] As they spoke, Nurse Hurdle entered the room and gave Ms. Vinson the 20 milligram dose of morphine ordered by Dr. Ungarino. Ms. Vinson's eyes immediately closed. She never regained consciousness and died approximately three and a half hours later. When the nursing staff saw that Ms. Vinson had stopped breathing, they did not call an emergency code in light of plaintiff's prior decision that no additional life-saving measures should be administered.

Plaintiff subsequently filed suit against Dr. Ungarino and Phoebe Putney for the wrongful death of her mother. She alleged that Dr. Ungarino violated the standard of care by ordering the rapid infusion of 20 milligrams of morphine into an end-stage COPD patient, and that administration of such a high dosage caused Ms. Vinson's death. Plaintiff further alleged that Nurse Hurdle violated the nursing standard of care by administering the overdose of morphine, and that Phoebe Putney could be held vicariously liable for her actions. Defendants answered and, after discovery, moved for summary judgment on proximate cause grounds.[4] The trial court denied summary judgment to Dr. Ungarino but granted it to Phoebe Putney, leading to these companion appeals.

---

occasions before and during her hospitalization.

[3] Dr. Kitchen disputed this version of events and testified that after the code had been administered, Ms. Vinson remained in an unconscious and unresponsive state. According to Dr. Kitchen, it would have been "impossible" for Ms. Vinson to have been speaking with her family after the code because she was in an "essentially comatose" condition.

[4] Defendants did not contest that plaintiff presented sufficient evidence to create a genuine issue of material fact over whether Dr. Ungarino and Nurse Hurdle violated the standard of care applicable to each of them.

*Case No. A08A1670*

1. Dr. Ungarino contends that the trial court erred in denying summary judgment to him because plaintiff failed to produce evidence that the 20 milligrams of morphine proximately caused Ms. Vinson's death. According to Dr. Ungarino, the uncontroverted evidence shows that Ms. Vinson died from her underlying disease process, end-stage COPD. We disagree.

> Negligence alone is insufficient to sustain recovery for wrongful death in a medical malpractice action. It must be proven that the death of a patient proximately resulted from such want of care or skill. A bare possibility of such result is not sufficient. Further, there can be no recovery in a wrongful death action based on medical negligence where there is no showing to any reasonable degree of medical certainty that the patient's death could have been avoided.

(Citations and punctuation omitted.) *Grantham v. Amin*, 221 Ga. App. 458, 459 (471 SE2d 525) (1996). In applying these principles, however, we are always mindful "that questions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and undisputed cases." (Citation and punctuation omitted.) *Brookview Holdings v. Suarez*, 285 Ga. App. 90, 97 (2) (645 SE2d 559) (2007). Furthermore, in the summary judgment context, the nonmoving party "is not required to produce evidence demanding judgment for that party, but only to present evidence which raises a material issue of fact." (Citation omitted.) *Layfield v. Dept. of Transp.*, 280 Ga. 848, 850 (1) (632 SE2d 135) (2006).

Guided by these principles, we turn to the record in the present case. Expert testimony from the plaintiff and defendants' medical expert witnesses established that morphine decreases respiratory drive, and that the greater the dose of morphine, the greater the respiratory depressive effect. The plaintiff's expert pulmonologist, Dr. Thomas Hyers, opined that the rapid infusion of 20 milligrams of morphine, which he described as an extremely large dose, would have had a severe respiratory depressive effect on an individual who was completely healthy, much less a patient with severe COPD. According to Dr. Hyers, the depressive effect of morphine, caused by the opiate acting on the patient's neurons in the brain stem, lasts for several hours after the drug is administered. Accordingly, Dr. Hyers opined that the rapid infusion of 20 milligrams of morphine caused Ms. Vinson to experience extreme respiratory depression to the point

that the administration of the drug "more likely than not caused Ms. Vinson to die before she otherwise would have."[5]

Based on this expert testimony, a jury question was presented as to whether the rapid infusion of 20 milligrams of morphine ordered by Dr. Ungarino proximately resulted in Ms. Vinson's death. See *Rodrigues v. Ga.-Pacific Corp.*, 290 Ga. App. 442, 445 (661 SE2d 141) (2008) (expert medical testimony that chlorine gas chemicals "most likely caused" the patient's pneumonia was sufficient to create a jury question over causation); *Hawkins v. Greenberg*, 166 Ga. App. 574, 577 (1) (a) (304 SE2d 922) (1983) (expert medical testimony that suppository "most likely" caused the patient's allergic reaction was sufficient to create a jury question over causation). Compare *Estate of Patterson v. Fulton-DeKalb Hosp. Auth.*, 233 Ga. App. 706, 710 (2) (505 SE2d 232) (1998) (expert medical testimony that the alleged negligence "may have contributed" to the patient's injury and death was legally insufficient to establish causation). Even if Dr. Hyers later equivocated on the causation issue during the course of his deposition, such testimony simply created an issue of credibility for the jury to resolve. See *Rodrigues*, 290 Ga. App. at 445-446. "[I]n reviewing this summary judgment case, we must construe all evidence in favor of the nonmovant and need only determine whether *some* competent evidence supported plaintiff's claim, not whether *all* evidence supported that claim." (Emphasis in original.) Id. at 447 (on motion for reconsideration).

(a) Dr. Ungarino argues that Dr. Hyers's opinion testimony was speculative because he was unwilling in his deposition to give a specific time frame of how much longer Ms. Vinson would have lived, absent the administration of the morphine. It was sufficient, however, for Dr. Hyers to provide his expert opinion that Ms. Vinson died prematurely as a result of the morphine.[6] Any remaining question concerning exactly how much longer she would have lived in the absence of the morphine being administered goes only to the quantum of damages, not to the issue of proximate causation. See *Velez v. Bethune*, 219 Ga. App. 679, 681 (2) (466 SE2d 627) (1995) (emphasizing that "the imminence and inevitability of death [of the

---

[5] Although Dr. Hyers rendered his medical opinion during the course of his deposition, Dr. Ungarino emphasizes that Dr. Hyers also submitted an affidavit containing his opinion about causation. According to Dr. Ungarino, the trial court erred in considering the affidavit as part of the record on summary judgment because no medical records were attached to it. Any error in considering the affidavit was harmless, however, because the affidavit was cumulative of Dr. Hyers's deposition testimony. See *Whalen v. Isaacs*, 233 Ga. App. 367, 367-368 (1) (504 SE2d 214) (1998); *Pague v. Pendley*, 177 Ga. App. 573, 574-575 (1) (340 SE2d 190) (1986).

[6] We note that several of the defendants' own witnesses and experts testified that in most cases a physician cannot precisely predict when a terminally ill patient is going to die.

decedent] go only to the quantum of damages and do not vitiate the doctor's initial dereliction'').

(b) Relying upon *Dowling v. Lopez*, 211 Ga. App. 578 (440 SE2d 205) (1993), Dr. Ungarino also argues that there is no wrongful death cause of action for "loss of chance for extended survival under Georgia law." Put another way, Dr. Ungarino contends that, based on *Dowling*, a wrongful death action is unavailable in cases where the decedent was terminally ill and the alleged medical negligence simply hastened the decedent's otherwise inevitable death. Dr. Ungarino's reading of *Dowling* is overly broad. In that case, the defendant physician misdiagnosed a female patient with Crohn's disease when she in fact had stomach cancer. Id. The patient subsequently died from the cancer, and the family brought an action against the physician for wrongful death. Id. Upholding the trial court's grant of summary judgment to the defendant physician, we reasoned that the plaintiff had failed to show that the physician's misdiagnosis was the proximate cause of the decedent's death, since "there [was] no proof that the decedent did not have terminal cancer when defendant first treated the decedent." Id. at 581 (2).

*Dowling* stands for the proposition that proximate cause cannot be established in a failure to diagnose case, if the decedent suffered from an incurable medical condition at the time of the alleged misdiagnosis. In that narrow category of cases, proof of proximate cause fails as a matter of law because the plaintiff cannot demonstrate that the death of the decedent was caused by anything other than the decedent's underlying disease process.

The present case, however, does not involve the failure to diagnose an incurable illness. Rather, this case is more like *Velez v. Bethune*, 219 Ga. App. 679, where there was evidence that the death resulted from the affirmative conduct of the defendant physician, not by the decedent's underlying medical condition. In *Velez*, an infant was born prematurely and was on a mechanical ventilator. Id. The infant died when the defendant physician removed the infant from the ventilator, allegedly without the parent's consent. Id. We concluded that summary judgment in favor of the physician was improper, given that there was evidence that the physician's removal of the infant from the ventilator caused the infant's premature death. Id. at 680-681 (2). In other words, it was sufficient that there was evidence that the physician's affirmative act of negligence was the immediate cause of the infant's death, even if the infant ultimately would have died from his underlying medical condition. Id. In reaching this conclusion, we emphasized that "[t]he case law regarding the negligent failure to diagnose a terminal disease is simply inapposite to the deliberate acts of withholding or deescalating medical assistance." Id. at 680-681 (2).

Similarly, here the plaintiff presented evidence of an affirmative act of medical negligence by the defendant physician resulting in the decedent dying earlier than she otherwise would have died, namely, Dr. Ungarino's affirmative clinical decision to order the rapid infusion of 20 milligrams of morphine. Hence, the present case is controlled by *Velez*, not *Dowling*, and under the logic of that case law, a jury must resolve whether Ms. Vinson's death was proximately caused by the affirmative actions of Dr. Ungarino or her end-stage COPD.

(c) Finally, Dr. Ungarino contends that proximate cause cannot be established because no efforts were made to resuscitate Ms. Vinson when she went into respiratory distress for a second time following the administration of the morphine, based on plaintiff's prior decision that no life-saving measures should be administered. In this respect, Dr. Ungarino appears to contend that plaintiff's instructions not to have resuscitation efforts performed on Ms. Vinson constituted an intervening act of a third party that cut off any medical negligence he committed as a matter of law. We cannot agree.

> It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act or omission of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury.

(Citation and punctuation omitted.) *Powell v. Harsco Corp.*, 209 Ga. App. 348, 350 (2) (433 SE2d 608) (1993). Notably, "a causal connection between an original act of negligence and injury to another is not broken by the intervening act of a third person, if the nature of such intervening act was such that it could reasonably have been anticipated or foreseen by the original wrong-doer." (Citations and punctuation omitted.) *Wade v. Polytech Indus.*, 202 Ga. App. 18, 22 (3) (413 SE2d 468) (1991).

Here, there is evidence in the record that at the time Dr. Ungarino wrote the order for the rapid infusion of 20 milligrams of morphine, he was aware that plaintiff had made a decision that Ms. Vinson should have a "Do Not Resuscitate" status and that no additional life-saving measures should be administered if she again went into respiratory arrest. Under these circumstances, even if plaintiff's decision could be construed as an intervening cause, a jury would be entitled to conclude that the decision was reasonably foreseeable and should have been factored into Dr. Ungarino's

decision-making concerning the dosage of morphine. See generally *Walker v. Giles*, 276 Ga. App. 632, 645 (2) (624 SE2d 191) (2005); *Wade*, 202 Ga. App. at 22-23 (3). As such, Dr. Ungarino has failed to assert a valid basis for reversal.

For these combined reasons, we conclude that the trial court committed no error in denying summary judgment to Dr. Ungarino on the issue of proximate cause. A jury may ultimately conclude that Ms. Vinson died from her end-stage COPD rather than from the administration of the morphine. In this respect, a jury may find that the administration of the morphine simply eased Ms. Vinson's pain and suffering in her final moments of life, allowing her to die in the most comfortable manner possible under the circumstances. But "[t]he solution of these questions, depending as it does upon inferences to be drawn from the evidence and the weight and credit to be given to the conflicting testimony of witnesses, is for decision by a jury," not by a court on motion for summary judgment. *Outside Carpets v. Indus. Rug Co.*, 228 Ga. 263, 269 (185 SE2d 65) (1971).

### Case No. A08A1669

2. Plaintiff maintains that the trial court erred in granting summary judgment to Phoebe Putney based on the borrowed servant defense. Although Phoebe Putney moved for summary judgment on the ground that plaintiff could not establish proximate cause,[7] the trial court granted summary judgment on the alternative ground — raised sua sponte by the trial court — that Nurse Hurdle's alleged negligence could not be imputed to the hospital because she was the borrowed servant of Dr. Ungarino. We agree with plaintiff that the trial court erred in sua sponte granting summary judgment on that ground.

> A trial court may grant summary judgment sua sponte, but this authority is not unlimited. In addition to ensuring the record supports such a judgment, the trial court must ensure that the party against whom summary judgment is rendered is given full and fair notice and opportunity to respond prior to entry of summary judgment. Thus, we have reversed summary judgment where the parties did not argue the merits of a claim either in briefs or at a hearing.

(Punctuation and footnotes omitted.) *Brito v. Gomez Law Group*, 289

---

[7] As discussed in Division 1, a genuine issue of material fact exists with respect to proximate cause, and so summary judgment in favor of Phoebe Putney on that ground would have been improper.

Ga. App. 625, 630 (3) (658 SE2d 178) (2008).

Here, Phoebe Putney did not raise the borrowed servant defense in its answer, the pretrial order, its summary judgment brief, or at the hearing on the summary judgment motions. And while the trial court at the hearing expressed some concerns about whether plaintiff could succeed on her claim against Phoebe Putney, the court never referenced the borrowed servant defense and never stated that it wanted to hear from the parties on the application of that defense to the present case. It follows that plaintiff was not given adequate notice and an opportunity to be heard on the issue of whether the borrowed servant defense barred the wrongful death claim against Phoebe Putney. Accordingly, the trial court erred in granting summary judgment sua sponte on that issue, and we reverse. See *Brito*, 289 Ga. App. at 630-631 (3) (a); *Aycock v. Calk*, 222 Ga. App. 763, 763-764 (476 SE2d 274) (1996); *Hodge v. SADA Enterprises*, 217 Ga. App. 688, 690 (1) (458 SE2d 876) (1995).

*Judgment reversed in Case No. A08A1669. Judgment affirmed in Case No. A08A1670. Ruffin, P. J., and Andrews, J., concur.*

DECIDED DECEMBER 18, 2008.

*Brown & Shamp, Laura M. Shamp*, for Pruette.

*Langley & Lee, Carl R. Langley, Joseph P. Durham, Jr.*, for Phoebe Putney Memorial Hospital.

*Weinberg, Wheeler, Hudgins, Gunn & Dial, Carol P. Michel, Rachel A. Fuerst*, for Ungarino.