A06A0735. KING v. ZAKARIA.
(634 SE2d 444)

ELLINGTON, Judge.

In this medical malpractice case, Elrena King, individually and as executrix of the estate of decedent Douglas Carter King, appeals from the denial of her motion for new trial following a judgment in favor of Dr. M. S. Zakaria and his professional corporation (collectively, "Dr. Zakaria"). The decedent died as a result of massive bleeding from his pulmonary artery the morning after Dr. Zakaria performed surgery to remove the decedent's right lung. In her complaint, King alleged that Dr. Zakaria violated the standard of care by failing to properly close the decedent's pulmonary artery during surgery. She also alleged that Dr. Zakaria's post-operative monitoring and treatment of the decedent, including his failure to timely read the decedent's x-rays, violated the standard of care. In addition, King claimed that Dr. Zakaria abandoned the decedent after surgery and requested punitive damages based upon her contention that Dr. Zakaria's abandonment evidenced a conscious indifference to the consequences.

At trial, the court directed a verdict in favor of Dr. Zakaria on King's abandonment claim, her punitive damages claim, and her claim that the decedent's death could have been avoided if Dr. Zakaria had read the decedent's x-rays in a timely manner. The jury returned a verdict in favor of Dr. Zakaria on King's remaining claims. On appeal, King contends the trial court erred when it granted the directed verdicts. She also challenges the court's exclusion of impeachment evidence and the court's instructions to the jury. Because King has failed to demonstrate reversible error, we affirm.

---

[5] See *Firsanov v. State*, 270 Ga. 873, 874 (1) (513 SE2d 184) (1999); see also *Yates v. State*, 263 Ga. App. 29, 30 (1) (587 SE2d 180) (2003).

The evidence at trial showed the following facts. Dr. Zakaria is a board-certified surgeon specializing in thoracic and vascular surgery. On December 17, 1998, the decedent was a lung cancer patient who underwent surgery to remove a cancerous tumor from his right lung at Henry Medical Center. Before the surgery, the decedent signed an informed consent form which listed the material risks of the surgery, which include the possibility of severe loss of blood, cardiac arrest, and death.[1] It is undisputed that these complications can arise even when there has been no negligence by the surgeon.

During the surgery, Dr. Zakaria determined that the size and placement of the cancerous tumor required the removal of the decedent's entire right lung. Dr. Zakaria testified that he used three surgical ties[2] to close off each of the blood vessels leading to and from the lung before he removed the decedent's lung. He explained that he cut each vessel between the ties so that two ties remained in the decedent's body and one was removed with the decedent's lung. He also testified that this method was the only one he had ever used when performing surgery and that he had never had a post-operative tie failure. According to Dr. Zakaria, after he removed the decedent's lung, he checked to ensure that there was no bleeding from any of the blood vessels that he had severed. He also testified that he dictated his operative report later the same day, and the record shows that the operative report was consistent with his trial testimony.

The surgeon who assisted Dr. Zakaria during the surgery testified that he personally observed Dr. Zakaria use three surgical ties to close the decedent's blood vessels in a manner that was "completely consistent" with the operative report. The surgeon also testified that there was no bleeding from the decedent's blood vessels after Dr. Zakaria tied them off. No other eyewitness to the surgery testified to the contrary. Further, there was no dispute at trial that tying off blood vessels in the manner described by Dr. Zakaria and his operative report was consistent with the standard of care.

Following surgery, the decedent was moved to the hospital's critical care unit. Dr. Zakaria wrote post-operative care instructions for the hospital staff, which included a request for daily lab tests and x-rays and instructions for the staff to call him if the decedent's condition changed. The hospital's staff included a physician who specialized in emergency medicine and who was available during the night to immediately evaluate the decedent in the event of a life-threatening condition and provide emergency care until Dr. Zakaria

---

[1] The adequacy of the decedent's informed consent was not an issue at trial.

[2] The witnesses also described these ties as sutures or ligatures, but for consistency they are referred to herein exclusively as "ties."

could get to the hospital. When Dr. Zakaria left the hospital on the evening of the decedent's surgery, the decedent was resting comfortably and his condition was stable. The decedent's condition did not change significantly during the night. Dr. Zakaria remained "on call" at home throughout the night and even wore his pager to bed, but the hospital did not page him.

The next day, at 6:10 a.m. and again between 6:30 and 6:50 a.m.,[3] the hospital staff took x-rays of the decedent's chest, to be read by Dr. Zakaria and the hospital's radiologist later that day. Shortly after sitting up to have the second x-ray taken, the decedent began to have trouble breathing. The staff suctioned the decedent's throat and intubated him to assist his breathing. The decedent's condition quickly deteriorated and, at approximately 7:00 a.m., the head nurse activated the hospital's emergency "code" system. A specially-trained team of staff members, including the emergency room physician, rushed to the decedent's room and began evaluating and treating the decedent. Shortly thereafter, the decedent went into cardiac arrest and the staff attempted to resuscitate him.

In the meantime, the head nurse paged Dr. Zakaria, who was driving to Atlanta for a medical meeting at Grady Hospital. After learning that the decedent was experiencing complications, Dr. Zakaria exited the highway, turned around, and drove to the hospital, arriving in the patient's room by 7:37 a.m. Dr. Zakaria examined the decedent and ordered blood tests. The staff continued to perform CPR on the decedent until Dr. Zakaria determined that the decedent could not be resuscitated. Dr. Zakaria pronounced him dead at 8:25 a.m.

During an autopsy at the hospital the next day, two pathologists examined the decedent's pulmonary artery, which had an open "stump" where it should have been tied off. The edge of the stump was "irregular," and there was a loose tie on the artery that was attached to the artery's wall. The pathologists also observed that the decedent had "severe coronary arteriosclerosis," thickening of the heart muscles, and evidence of other chronic diseases of the arteries, heart, and left lung. The pathologists concluded that the decedent's death resulted from massive bleeding from the pulmonary artery into the chest cavity as a result of a post-operative tie failure or a tear in the artery.

According to expert testimony, post-operative tie failure is a recognized risk and potential complication of this type of surgery, and such failures can and do occur in the absence of negligence. None of the expert witnesses could state with any certainty when or why the

---

[3] The evidence showed that the decedent's medical records were inconsistent as to the exact times certain procedures and phone calls took place. The nurse caring for the decedent on the morning of his death testified that the variation could have resulted from the use of different clocks and watches by different hospital personnel when recording the times.

ties failed and the decedent started bleeding in this case. It was undisputed, however, that if Dr. Zakaria had left the artery untied or loosely tied when he severed the artery during surgery, the decedent would have bled to death within minutes. More importantly, there was no dispute that, by the time the decedent began to exhibit signs of complications, his condition was virtually irreversible and there was only a slight possibility that anyone could have performed emergency surgery in time to save him.

In granting a partial directed verdict to Dr. Zakaria, the trial court found there was no evidence that Dr. Zakaria violated the standard of care by leaving the hospital under the circumstances presented. The court also found that King had presented no evidence that Dr. Zakaria's failure to review the decedent's x-rays caused the decedent's death. The court noted that the undisputed evidence showed the decedent could not have survived once he started bleeding internally absent emergency surgery which, under the circumstances, could not be performed in time to save his life. The jury returned a verdict in favor of Dr. Zakaria on King's remaining malpractice claims. Following the denial of her motion for new trial, King appeals.

1. King contends the court erred in excluding the endorsement of Dr. Zakaria's 2000-2001 professional liability insurance policy as impeachment evidence. The endorsement, which covered a period over a year after the alleged malpractice in this case, showed that Dr. Zakaria's insurance rates were reduced for that period because he was working fewer hours and was classified as "semi-retired." King argues that this evidence would have impeached Dr. Zakaria's admission during cross-examination that he was not semi-retired. She claims that this evidence was relevant to the question of Dr. Zakaria's credibility.

The admission of evidence is "committed to the sound discretion of the trial court, whose determination shall not be disturbed on appeal unless it amounts to an abuse of discretion." (Citation and punctuation omitted.) *Chambers v. Gwinnett Community Hosp.*, 253 Ga. App. 25, 26 (1) (557 SE2d 412) (2001). Further, it is well-settled law that evidence of a physician's professional liability insurance is generally inadmissible in a medical malpractice case. Id.

> As our Supreme Court has recognized, the concern is that introducing evidence of a defendant's insurer could motivate a jury to award increased damages. And although jurors could well surmise that a doctor has malpractice insurance,

the introduction of the evidence tends to emphasize something that is usually irrelevant and that may have an adverse effect on the quality of the jury's deliberations and conclusions.

(Citations and punctuation omitted.) Id.

In excluding the evidence in this case, the trial court expressed concern about whether the insurance endorsement, which was created and issued by the insurance company, could even be considered a prior inconsistent statement by Dr. Zakaria. The court ruled that, even if it was a prior inconsistent statement, the evidence involved a collateral matter to the issues on trial and was more prejudicial than probative. Under the circumstances presented in this case, we agree and find that the trial court did not abuse its discretion in excluding the evidence. *Chambers v. Gwinnett Community Hosp.*, 253 Ga. App. at 28 (1).

2. King contends the trial court erred in directing a verdict in favor of Dr. Zakaria on her medical abandonment claim. A trial court properly grants a directed verdict in favor of the defendant if there is no conflict in the evidence as to any material element of the plaintiff's claim and the evidence adduced demands a defense verdict. OCGA § 9-11-50 (a); *Walker v. Giles*, 276 Ga. App. 632 (624 SE2d 191) (2005). Based upon the undisputed evidence of record, we find that King failed to establish the essential elements of an abandonment claim.

(a) In demonstrating that a physician abandoned his or her patient, a plaintiff must show that (1) the physician became unavailable to treat the patient at a time when the physician knew the patient was at a critical stage of treatment, and (2) the physician either failed to provide sufficient notice to enable the patient to secure another physician or failed to arrange for a competent physician to care for the patient in his or her absence. See *Beatty v. Morgan*, 170 Ga. App. 661, 665 (3) (317 SE2d 662) (1984); *Kenney v. Piedmont Hosp.*, 136 Ga. App. 660, 663 (2) (222 SE2d 162) (1975); *Norton v. Hamilton*, 92 Ga. App. 727, 731 (89 SE2d 809) (1955). Although there are relatively few Georgia cases addressing claims of abandonment by physicians, such claims are allegations of medical negligence. *Bradford v. Rossi*, 249 Ga. App. 325, 326 (1) (548 SE2d 70) (2001). Therefore, as in all medical malpractice cases, the plaintiff must present expert testimony to show both that the physician's actions violated the standard of care and that such negligence was the actual and proximate cause of the patient's injuries to a reasonable degree of medical certainty. *Beach v. Lipham*, 276 Ga. 302, 304 (1) (578 SE2d 402) (2003) (expert testimony is necessary to overcome the presumption that a physician exercised due care and skill in treating the

patient); *Walker v. Giles*, 276 Ga. App. at 638 (1); *Berrell v. Hamilton*, 260 Ga. App. 892, 896 (581 SE2d 398) (2003); *Bradford v. Rossi*, 249 Ga. App. at 326 (1).

On appeal, King claims that a directed verdict was improper because the evidence showed Dr. Zakaria abandoned the decedent by leaving the hospital without ensuring that there was a qualified "backup" surgeon available to perform emergency surgery in case the decedent experienced a "massive bleed-out" while Dr. Zakaria was unavailable. The trial transcript shows, however, that King presented no expert testimony that Dr. Zakaria violated the standard of care by being away from the hospital under the circumstances presented.[4] In contrast, Dr. Zakaria's expert witness specifically testified that Dr. Zakaria's actions between the time he left the hospital and the time the decedent died the next morning were consistent with the standard of care. Accordingly, because King failed to present any evidence to show that Dr. Zakaria violated the standard of care by abandoning the decedent, the trial court properly directed a verdict in favor of Dr. Zakaria on King's abandonment claim. *Walker v. Giles*, 276 Ga. App. at 632.

(b) Moreover, even if King had shown that Dr. Zakaria violated the standard of care when he was absent from the hospital under the circumstances presented, her abandonment claim must still fail. As previously mentioned, and as discussed more fully in Division 4 (b), infra, a patient in a medical malpractice case cannot prevail simply by showing that a physician violated the standard of care. *Walker v. Giles*, 276 Ga. App. at 638. The plaintiff must also present expert testimony that the physician's negligence was the actual and proximate cause of the patient's injuries to a reasonable degree of medical certainty. Id.

As shown in Division 4 (b), infra, King failed to present any expert testimony that there is a reasonable degree of medical certainty the decedent would have survived, even if Dr. Zakaria or another qualified surgeon had been at the hospital when the decedent began to bleed internally. Therefore, because King did not show that Dr. Zakaria's alleged abandonment caused the decedent's death, Dr. Zakaria was entitled to a directed verdict on this claim.

---

[4] We note that, at trial, King presented edited portions of videotaped depositions of two expert witnesses. The trial transcript shows, however, that King's counsel waived the transcription of the specific testimony presented at trial. Further, on appeal, King does not cite to any testimony by these experts in support of her arguments, even though the videotapes and unedited deposition transcripts are in the record. Therefore, we find that King has abandoned any contention on appeal that her experts' testimony supported her cause of action and precluded a directed verdict in favor of Dr. Zakaria. See Court of Appeals Rule 25 (c) (3) (i) (this Court will not search the record for evidence to support an appellant's enumerated error).

3. King argues that the court erred in directing a verdict on the question of punitive damages as it related to the abandonment claim. She argues Dr. Zakaria showed a conscious indifference to the decedent's well-being by abandoning him and driving to Atlanta. See OCGA § 51-12-5.1 (an award of punitive damages requires clear and convincing evidence of wilful misconduct, malice, fraud, etc. that would support a presumption of the defendant's conscious indifference to the consequences of his or her actions). In Division 2, supra, we found that the trial court properly concluded that Dr. Zakaria did not commit medical abandonment as a matter of law. Therefore, we also find that the trial court properly granted a directed verdict on the issue of punitive damages arising from the alleged abandonment.

4. King argues the trial court erred in directing a verdict on her claim that, if Dr. Zakaria had read the decedent's x-rays in a timely manner, he might have been able to save the decedent's life by performing emergency surgery. We disagree.

(a) According to the radiologist's report, which was not available until after the decedent died, the x-rays taken on the morning of December 18, 1998, showed increased opacity in the decedent's right chest cavity as compared to the post-operative x-rays taken the previous evening. This opacity may have indicated there was some internal bleeding, although other factors could have caused the opacity. As noted above, however, at the time the x-rays were taken that morning, the decedent's condition appeared to be stable and he did not exhibit any symptoms of internal bleeding or other complications. On appeal, King has failed to cite to any expert testimony that Dr. Zakaria violated the standard of care by failing to review the x-rays immediately after they were taken (or having another physician review them on his behalf) when he had no knowledge that the decedent's condition was no longer stable. Further, although King contends that Dr. Zakaria violated the standard of care by failing to read the x-rays in a timely manner after he became aware that the decedent's condition was deteriorating, there is no expert evidence to support her contention. Therefore, King's claim must fail. *Walker v. Giles*, 276 Ga. App. at 632.

(b) More importantly, even if King had presented expert evidence that Dr. Zakaria violated the standard of care by failing to read the x-rays in a timely manner, King presented no evidence at trial to show that there was a reasonable degree of medical certainty the decedent would not have died but for Dr. Zakaria's alleged oversight.

> To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of

the injury sustained. In other words, a plaintiff must prove that the defendants' negligence was both the cause in fact and the proximate cause of his injury. . . . Medical causation must be proved to a reasonable degree of medical certainty and cannot be based on mere speculation. A bare possibility of causing the injury complained of is not sufficient proof of causation as a matter of law.

(Citations and punctuation omitted.) *Berrell v. Hamilton*, 260 Ga. App. at 896. In other words, "there can be no recovery for medical negligence involving an injury to the patient where there is no showing to any reasonable degree of medical certainty that the injury could have been avoided [if] the physician [had] complied with the applicable standard of care." (Citation and punctuation omitted.) *Walker v. Giles*, 276 Ga. App. at 638 (1).

In this case, the record shows that it was apparent from the beginning of this litigation that King would have difficulty proving Dr. Zakaria's allegedly negligent post-operative care caused the decedent's death. In the expert affidavit attached to King's complaint, King's expert opined that, within a reasonable degree of medical certainty, once the decedent started to bleed post-operatively, his condition was "unsalvageable." The expert also specifically stated his opinion that, based upon his review of the decedent's medical records, "no reasonable physician or medical professional would have been able to act any faster [to save the decedent's life] than the attending physicians or medical professionals did [in this case], once the bleeding began."

At trial, no expert witness testified to the contrary or offered an opinion that, within a reasonable degree of medical certainty, the decedent would not have died if Dr. Zakaria had been at the hospital and had read the x-rays sooner. Instead, the evidence confirmed that, by the time the decedent started experiencing difficulty breathing and was intubated, his condition was "almost irreversible." The record also shows that, in response to Dr. Zakaria's motion for a directed verdict, King's counsel conceded that "it is hard to prove to the jury at this point that [the decedent's] life could have been saved if there had been a surgeon standing by" when the decedent's condition deteriorated. Reading the motion colloquy in context, the record clearly demonstrates that counsel abandoned King's claim that the decedent's death was caused by either Dr. Zakaria's absence or his failure to timely read the x-rays. See also Division 2 (b), supra (King's abandonment claim).

On appeal, however, King attempts to resurrect her claim, relying on testimony by Dr. Zakaria's expert witness. The witness responded to a hypothetical on cross-examination by testifying that,

if Dr. Zakaria had been at the hospital when the decedent started having problems, Dr. Zakaria *"possibly could have had a chance* to return [the decedent] to the operating room and save his life." (Emphasis supplied.)

Pretermitting whether, at trial, King abandoned her claim that Dr. Zakaria's failure to timely read the x-rays caused the decedent's death, we find the evidence upon which she now relies is insufficient as a matter of law to establish that, within a reasonable degree of medical certainty, the decedent would not have died but for Dr. Zakaria's alleged negligence. *Walker v. Giles,* 276 Ga. App. at 638 (1); *Berrell v. Hamilton,* 260 Ga. App. at 896 (medical causation cannot be based upon mere speculation or a bare possibility that the alleged negligence caused the patient's injury). Accordingly, the trial court did not err in directing a verdict in favor of Dr. Zakaria on this claim.

5. In four related enumerations, King contends the trial court erred in giving certain jury instructions.[5] For the following reasons, King's contentions must fail.

(a) King argues that the court committed reversible error when it charged the jury that witnesses are presumed to speak the truth.[6] The Supreme Court of Georgia, however, has decided this issue adversely to King in *Blackmon v. State,* 272 Ga. 858, 860 (3) (536 SE2d 148) (2000), a criminal case involving a similar jury instruction. See also *Whatley v. State,* 270 Ga. 296, 300 (10) (b) (509 SE2d 45) (1998) (the use of a "presumption-of-truthfulness" charge is not unconstitutional and does not constitute reversible error); *Noggle v. State,* 256 Ga. 383, 385-386 (4) (349 SE2d 175) (1986) (recommending against the use of such charge because it could be misleading to the jury, but finding the use of the charge is not unconstitutional). Accordingly, King's argument must fail.

(b) King argues that, because the court gave the presumption-of-truthfulness charge, the court should have also given the jury a *Prophecy* charge. See *Prophecy Corp. v. Charles Rossignol, Inc.,* 256 Ga. 27, 30 (1) (343 SE2d 680) (1986). King contends that Dr. Zakaria

---

[5] The charge conference was not transcribed.

[6] The court charged the jury that they were the sole judges of the credibility or believability of the witnesses and that they should resolve any conflicts in the evidence whenever possible. The court further instructed the jury that

[a]ll witnesses are presumed to speak the truth. And if possible you should not attribute a false statement or perjury to any of them. However, if you cannot do this it then becomes incumbent upon you to believe that evidence that you find to be most reasonable and believable to you and decide the case by a preponderance of the evidence as you find it to be. . . . I charge you that when witnesses appear and testify they are presumed to speak the truth unless they are impeached in some manner provided by law. To impeach a witness means to discredit the witness or to prove the witness unworthy of belief.

gave contradictory testimony and that, under *Prophecy*, the trial court was required to charge the jury that it must construe Dr. Zakaria's contradictory testimony against him. Pretermitting whether any of Dr. Zakaria's trial testimony was, in fact, contradictory or whether this issue was properly preserved for appellate review,[7] the record shows that, in addition to his own testimony, Dr. Zakaria presented other evidence at trial which supported his defense and authorized a verdict in his favor. A *Prophecy* charge is appropriate only when the party who gave the contradictory testimony is the sole witness testifying on his behalf. *Cornelius v. Hutto*, 252 Ga. App. 879, 882 (2) (558 SE2d 36) (2001). Accordingly, the jury was not required to construe the allegedly contradictory evidence against Dr. Zakaria. There was no error.

(c) King contends the court erred in charging the jury that the law presumes that medical services were performed in an ordinarily skillful manner. The instruction given is an accurate statement of the law, and its use does not constitute reversible error. *Beach v. Lipham*, 276 Ga. at 303-306 (1)-(3). Further, the record shows King failed to object to this instruction before the jury reached its verdict. Therefore, any error was waived. OCGA § 5-5-24 (a); *Strickland v. Dept. of Transp.*, 196 Ga. App. 322, 323 (3) (396 SE2d 21) (1990).

(d) King argues that, even if the above charges were proper, the combined effect of the charges confused the jury. King failed to raise this argument below, however, so it was waived. *City of Dalton v. Smith*, 210 Ga. App. 858, 859 (1) (437 SE2d 827) (1993) ("Where an entirely different objection is presented on appeal, we cannot consider it because this is a court for review and correction of error committed in the trial court.") (citation and punctuation omitted).

6. King contends the trial court erred in refusing to give her requested jury charge number 11.[8] Her argument on this issue simply restates those we addressed in Division 5 (a) and (b), supra. Moreover, the charge conference was not transcribed. Because the record does not show that King objected to the court's refusal to give this charge, any error is waived. *City of Dalton v. Smith*, 210 Ga. App. at 860 (5).

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

---

[7] King failed to raise this issue at trial.

[8] The record shows that she asked the court to instruct the jury as follows: "[W]here the pleadings of a party contain an admission which is inconsistent with the denial by the same party the admission prevails over the denial of [the] same party."

DECIDED JULY 5, 2006 —
RECONSIDERATION DENIED JULY 21, 2006 —

*Paul S. Weiner*, for appellant.
*Alston & Bird, Judson Graves, Brian R. Stimson*, for appellee.