A11A1870. PETERSON v. REEVES et al.
(727 SE2d 171)

MCFADDEN, Judge.

Monisa Reeves and the conservator of her estate sued psychiatrist Mark Peterson for injuries she sustained when she attempted suicide. Peterson moved for summary judgment, arguing that he had no duty to involuntarily commit Reeves, who was participating in voluntary, outpatient mental health care. Because we find that whether Peterson breached duties arising from the psychiatrist-patient relationship is an issue of fact, we affirm the denial of Peterson's motion for summary judgment.

We decline Peterson's invitation to establish a rule that, as a matter of law, a psychiatrist's statutory duty to "bring to the exercise of his profession a reasonable degree of care and skill," OCGA § 51-1-27, can never be violated by failure to involuntarily commit a patient. Such innovations are the province of the General Assembly.

We likewise decline Peterson's invitation to add "control" of the patient to the essential elements of medical malpractice in cases of suicide. Again such innovations are for the General Assembly. And the evidence at bar, construed as Reeves, the nonmovant on summary judgment, is entitled to have it construed, shows why judicial creation of such a rule would be improper. The evidence would authorize a jury to find that Peterson shares in the responsibility for a negligent failure to subject Reeves to a suicide or self-injury risk assessment, an

adequate psychiatric evaluation, and consideration for hospitalization; that he shares in the responsibility for the failure to stabilize Reeves in a proper medication regimen; and that he was negligent in failing to be available for consultation, or to have another psychiatrist available, when she was discharged. And the evidence would authorize a jury to find that those negligent omissions were a proximate cause of the defendant's lack of control over Reeves at the time of her attempted suicide as well as of the attempted suicide itself.

1. On appeal from the grant or denial of summary judgment, we apply a de novo standard of review. *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

> In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the non-moving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citations omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

Viewed in a light most favorable to Reeves as the nonmovant, the facts show that Reeves has a history of mental illness dating back to December 2001, and she began seeing Peterson at that time. She continued her treatment with Peterson, as well as other mental healthcare providers, until the incident at issue. She has been diagnosed with a schizo-affective disorder, a recurrent major depressive disorder, a bipolar disorder and psychotic disorders related to her other mental illnesses.

On August 5 or 6, 2005, Reeves's brother took her to the Parkridge Valley Hospital emergency room because she exhibited psychotic symptoms and behavior. She was not hospitalized. The next day, she attempted to jump from a balcony into an empty swimming pool. Reeves's friend called 911, and the police took her to the Hutcheson Medical Center emergency room. Reeves was found to be at high risk of committing suicide and was involuntarily committed to Northwest Georgia Regional Hospital.

Three days later, Reeves's status was changed from involuntary to voluntary, and on August 15, 2005, she was discharged to Horizons

Crisis Group Home, a voluntary treatment facility. On August 17, 2005, Horizons discharged Reeves at her request.

On August 23, 2005, Reeves's brother and sister-in-law again brought her to the Hutcheson Medical Center emergency room. Later that evening, she was admitted to Horizons Crisis Group Home. Peterson saw Reeves on August 26, 2005, diagnosed her with severe major depressive disorder with psychosis and bipolar disorder with psychosis, and prescribed medication.

On August 29, 2005, Reeves was discharged from Horizons either at her request or perhaps for unspecified "administrative reasons." According to the expert affidavit Reeves submitted with her complaint, there was no indication that Reeves was subjected to a suicide or self-injury risk assessment, an adequate psychiatric evaluation, or considered for hospitalization, even though she had been admitted to Horizons because of clinical instability and danger of suicide.

On the evening of August 31, 2005, Reeves poured gasoline over herself and set herself on fire.

Reeves and her conservator filed this action against multiple defendants, seeking damages for Reeves's pain and suffering, medical expenses, personal injuries and economic losses. Peterson moved for summary judgment. The trial court denied the motion. Peterson moved for reconsideration, and the trial court denied that motion as well. After we granted his application for interlocutory appeal, Peterson filed this appeal.

2. Peterson argues that Georgia law requires a psychiatrist to have control over a patient before he can be held liable for "any resulting harm" and that because he lacked control over Reeves, he had no affirmative duty to prevent her suicide attempt. His authority for that argument is the plurality opinion in *Bradley Center v. Wessner*, 250 Ga. 199 (296 SE2d 693) (1982).

*Bradley Center* is not on point. In that case, our Supreme Court, "granted certiorari to consider whether an individual other than the patient can recover for the alleged malpractice of the physician where that person is injured by the criminal conduct of the patient and there is no privity between the injured party and the physician." 250 Ga. at 200. The court's "concern . . . [was] with the first element [of the cause of action for negligence] — specifically, whether a physician can owe a legal duty of care to an injured party who was not his patient." Id. The court was at pains to make clear that *Bradley Center* was "not a malpractice case; it [was] an ordinary negligence case in which privity has never been an essential element." Id. at 203. The Supreme

Court explained that in

> cases[ ] called "classic medical malpractice actions" by the Court of Appeals, doctor-patient privity is essential because it is this "relation which exists between physician and patient which is a result of a consensual transaction" that establishes the legal duty to conform to a standard of conduct. *Norton v. Hamilton*, 92 Ga. App. 727, 731 [(89 SE2d 809) (1955)].

Id. at 201.

Rather the duty at issue in *Bradley Center* "ar[ose] out of the general duty one owes to all the world not to subject them to an unreasonable risk of harm." Id. at 201. Consequently the court found it necessary to address the "general rule [that] there is no duty to control the conduct of third persons to prevent them from causing physical harm to others." Id. (citing *Shockley v. Zayre &c., Inc.*, 118 Ga. App. 672 (165 SE2d 179) (1968); Restatement of Torts 2d, § 315). The court found applicable one of the exceptions to that rule: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." (Punctuation omitted.) Id. at 201-202 (citing Restatement of Torts 2d, § 319; Prosser, Torts, § 56, p. 349). Reeves was Peterson's patient. So they were in privity. It follows that *Bradley Center* has no application here.

This court has twice declined to extend *Bradley Center* to medical malpractice cases — most recently over a dissent joined by Judge Andrews. *Purcell v. Breese*, 250 Ga. App. 472, 476 (3) (552 SE2d 865) (2001); *Ga. Osteopathic Hosp. v. O'Neal*, 198 Ga. App. 770, 773-774 (3) (403 SE2d 235) (1991). We now decline that invitation for the third time — and with it we decline the invitation in Judge Andrews's dissent here to disregard the rationale of *Bradley Center* and distinguish *Purcell* on its facts.

3. Peterson next argues that no duty should be placed on a psychiatrist in a voluntary, outpatient facility to involuntarily commit any patient. But the General Assembly has imposed on every physician the duty to "bring to the exercise of his profession a reasonable degree of care and skill." OCGA § 51-1-27. If the decision whether to involuntarily commit a patient in such circumstances is to be excepted from that statutory duty, it is for the General Assembly to create the exception.

But the General Assembly has taken the opposite course — notwithstanding that it has established a public policy favoring

treatment of psychiatric patients in the least restrictive appropriate care setting. The chapter setting out that policy contains an immunity provision. Until last year, it read:

> Any . . . physician . . . who acts in good faith in compliance with the admission and discharge provisions of this chapter shall be immune from civil or criminal liability for his actions in connection with the admission of a patient to a facility or the discharge of a patient from a facility.

OCGA § 37-3-4. Effective July 1, 2011, the General Assembly amended that provision, adding language that reaffirms the long-recognized policy that physicians may be held liable for failing to meet the applicable standard of care: "[N]othing in this Code section shall be construed to relieve any . . . physician . . . from liability for failing to meet the applicable standard of care in the provision of treatment to a patient." See also *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 112 (2) (372 SE2d 265) (1988); OCGA § 51-1-27. Another statutory provision makes clear that patients receiving treatment for mental illness "shall receive care and treatment that is suited to [their] needs." OCGA § 37-3-162 (a).

Although the least-restrictive-placement policy might be relevant to the standard of care, it is not dispositive of whether a particular placement was suited to a particular patient's needs, and thus whether a medical professional's choice of that placement met the professional's duty of care to the patient. In *Misfeldt v. Hosp. Auth. &c. of Marietta*, 101 Ga. App. 579 (115 SE2d 244) (1960), for example, a woman diagnosed as a probable paranoid schizophrenic was hospitalized. She went into a bathroom and jumped from a third story window, injuring herself. We reversed the defendant's directed verdict, finding that the reasonableness of the steps taken by the hospital to protect the patient from herself, including placing her in a four-bed room *instead of a more restrictive environment*, thereby enabling her to jump out of a third-story window and sustain serious injuries, was a disputed issue for the jury. Id. at 583.

Peterson mischaracterizes the trial court's order when he argues that it creates an affirmative duty to involuntarily commit patients. The duty at issue is not, properly speaking, a duty to involuntarily commit. It is a much broader duty, which may, in particular cases, entail a duty to commit. Reeves alleges breach of the duty to care for her in compliance with the standard of care applicable to psychiatrists and counselors. The trial court's denial of summary judgment is nothing more than a determination that genuine issues of material

fact exist and that Peterson is not entitled to judgment as a matter of law. See *Benton*, 280 Ga. at 470.

Further, as we held in Division 2, while Peterson had no duty to guarantee that Reeves did not attempt suicide, he had a long-recognized duty inherent in the doctor-patient relationship to exercise the applicable degree of care and skill in the treatment of Reeves, his patient. *Brandvain v. Ridgeview Institute*, 188 Ga. App. at 112 (2). Peterson can be held liable if his treatment of Reeves fell below the requisite standard of care, and this failure proximately caused Reeves's injury. OCGA § 51-1-27.

Without citing any authority, Judge Andrews says that we should create an exception to this long-standing rule of law and hold that, if a patient is not hospitalized at the time of a suicide attempt, a psychiatrist can never be held liable for the consequences of that suicide attempt — even if the psychiatrist fails to exercise the applicable degree of care and skill in the treatment of the patient. We decline to usurp the authority of the General Assembly in this way. The law is clear: a physician may be held liable "for failing to meet the applicable standard of care in the provision of treatment to a patient." OCGA § 37-3-4.

Reeves attached to her complaint an expert affidavit in support of her allegations as required by OCGA § 9-11-9.1. The expert opined within a reasonable degree of medical certainty that Peterson did not comply with the requisite standard of care. Accordingly, whether Peterson's treatment of Reeves violated the standard of care is a question for the factfinder. See *Bowling v. Foster*, 254 Ga. App. 374, 381 (1) (b) (562 SE2d 776) (2002) (when a claim is based upon the failure of a professional to meet the requisite standards of the subject profession, it is necessary "to establish such standards and the violation thereof by expert testimony for the guidance of the jury").

Presiding Judge Mikell and Judge Andrews argue that Peterson is entitled to summary judgment on the ground of proximate causation. Judge Andrews contends that Reeves has failed to submit any evidence of causation. On the contrary, Reeves presented the expert testimony of Dr. William Reid that she should have been — but was not — subjected to a suicide or self-injury risk assessment, an adequate psychiatric evaluation, and consideration for hospitalization. And she presented the testimony of Dr. Robert Alpern, who testified that Peterson owed Reeves a duty, "that he was derelict in performing his duties, that there were damages that resulted from his dereliction of duty, and that the burning and the self-immolation was the direct result of his negligent care." As detailed in Judge

Dillard's special concurrence,[1] Dr. Alpern also testified that Peterson was negligent in failing to be available for consultation, or to have another psychiatrist available, when Reeves was discharged. It is true, as detailed in Judge Andrews's dissenting opinion, that there is also evidence pointing in the opposite direction. But it is not our place to weigh the evidence. "[Q]uestions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and undisputed cases." (Citation and punctuation omitted.) *Pruette v. Phoebe Putney Mem. Hosp.*, 295 Ga. App. 335, 338 (1) (671 SE2d 844) (2008). This is not such an undisputed case.

Presiding Judge Mikell would rule that because Reeves attempted suicide five days after Peterson last saw her, her injury is too remote to find that Peterson's negligence proximately caused it. Acknowledging that Reeves has presented expert testimony on the issue, he nonetheless would remove the case from the jury and instead determine, as a matter of law, an issue that is "undeniably a jury question." *Pruette*, 295 Ga. App. at 338 (1). But although such delay may be relevant to the issue of causation, it is not dispositive as a matter of law. Our cases have often recognized a cause of action where there is a delay of months or years between the breach of duty and the resultant harm. See, e.g., *Amu v. Barnes*, 283 Ga. 549 (662 SE2d 113) (2008) (cancer diagnosed four years after failure to perform a colonoscopy).

"In our de novo review of [the denial of] a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." (Citation and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

> Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred. What amounts to proximate cause is undeniably a jury question and is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent.

---

[1] Judge Dillard's special concurrence describes his reasoning as only "slightly different" from ours. His only difference appears to be his concern that our opinion "could be misconstrued as creating an affirmative duty for a mental healthcare professional to involuntarily commit a potentially suicidal patient." But we cannot avoid the issue of whether a psychiatrist's decision not to commit a patient can ever amount to a breach of the duty of care. Peterson squarely raises the issue on appeal, and the issue could be dispositive of the case.

(Citations and punctuation omitted.) *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003). And "Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty." Id. at 503. Reeves presented expert testimony that Peterson's breaches of his duty of care directly resulted in the foreseeable harm of Reeves attempting suicide.

Correctly noting that analysis of the issue of proximate cause, as distinguished from cause in fact, entails analysis of the scope of physicians' duties to patients, see *McAuley v. Wills*, 251 Ga. 3, 6-7 (5) (303 SE2d 258) (1983), Presiding Judge Mikell would also hold, as a matter of law, that Peterson violated no duty to Reeves. Presiding Judge Mikell reasons that as the "statutes are silent," it is for this court "to say whether a duty exists or not in the circumstances presented." So empowered, he would decline to "create" or "ratify," inter alia, a duty "to perform a 'suicide or self-injury assessment' and an 'adequate psychiatric assessment.'" Imposing such duties, he maintains, would constitute ill-considered "rearrangements of the practice of the profession of psychiatry" and are better left to the General Assembly.

But contrary to Presiding Judge Mikell's position, the statutes are not silent. OCGA § 51-1-27 provides, "A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." The statute leaves no room for procedure-by-procedure determinations by the appellate courts as to whether a cause of action should be allowed.

As Presiding Judge Mikell notes, the General Assembly has the authority to conduct committee hearings. So it has the competence, as well as the authority, to decide whether to create exceptions to that general duty. It has not done so. But it has mandated that juries hearing malpractice cases will hear expert testimony. See OCGA § 9-11-9.1. So juries have the competence, as well as the authority, to decide whether that general duty has been violated in particular cases. Appellate judges, although they have the raw power to create exceptions consistent with their policy preferences, have neither the competence nor the legitimate authority to do so, and should therefore exercise self-restraint.

As Judge Dillard aptly writes in his special concurrence, the evidence, when construed against Peterson, supports inferences of a "reasonable apprehension of harm" and is therefore sufficient to withstand Peterson's summary judgment motion. See *Purcell*, 250

Ga. App. at 475 (1) (the issue of proximate causation was for the jury in case where patient committed suicide nearly two months after psychiatrist last saw him).

We emphasize that the trial court did not create, and we are not creating, a new "duty to commit." Rather, we are simply recognizing that, under some circumstances, the failure to commit may constitute a breach of the well-established duty of care physicians owe patients, and that when a fact question has been created on that issue, it is for the jury.

For these reasons, we conclude that the trial court did not err in denying Peterson's motion for summary judgment.

*Judgment affirmed. Phipps, P. J., concurs. Dillard and Boggs, JJ., concur specially. Barnes, P. J., concurs in judgment only. Mikell, P. J., and Andrews, J., dissent.*

DILLARD, Judge, concurring specially.

While I agree with the majority's conclusion that the trial court did not err in denying Peterson's motion for summary judgment, I believe that the majority's opinion could be misconstrued as creating an affirmative duty for a mental healthcare professional to involuntarily commit a potentially suicidal patient. Accordingly, I specially concur in the judgment of the Court but write separately to emphasize that summary judgment was properly denied because genuine issues of material fact exist as to whether Peterson negligently breached the duty of care owed to Reeves prior to her discharge from hospitalization and whether such negligence was a proximate cause of Reeves's attempted suicide.

As is the case with all physicians, a psychiatrist's duty "is that inherent in the doctor-patient relationship, which, if breached by failure to exercise the requisite degree of skill and care, with that failure being the proximate cause of the injury, will result in liability."[2] And "[i]nextricably entwined with [the concept] of . . . proximate cause is a notion of foreseeability, not foreseeability as to the particular harm but that some harm would occur."[3] Moreover, no matter what test is used in determining the issue of proximate cause, "all of the tests envision some reasonable apprehension of harm."[4] Furthermore, questions of proximate cause ordinarily are "reserved solely for

---

[2] *Brandvain v. Ridgeview Inst., Inc.*, 188 Ga. App. 106, 112 (2) (372 SE2d 265) (1988); *see* OCGA § 51-1-27.

[3] *Brandvain*, 188 Ga. App. at 115 (3) (b) (punctuation omitted).

[4] *Id.* (punctuation omitted).

the jury and should not be resolved as a matter of law except in plain and indisputable cases."[5] This is not such a case.

Here, Peterson narrowly characterizes Reeves's claim as being that Peterson breached his duty of care by failing to involuntarily commit Reeves and further argues that Reeves failed to provide evidence of proximate cause. But the record shows that Peterson's duty of care was not so limited and that there was sufficient evidence of proximate cause to withstand summary judgment. Indeed, the expert affidavit of Dr. William Reid, attached to Reeves's complaint, avers that Peterson breached his duty of care by negligently failing "to adequately assess and appreciate [Reeves's] psychiatric condition and risk of harm to herself while she was a resident of Horizons and prior to discharging her to the community." Dr. Reid's affidavit further states that Reeves's suicide attempt could have been avoided if Peterson had not breached his duty of care.

In addition, Reeves's other expert witness, Dr. Robert Alpern, testified in his deposition as to several ways in which Peterson breached his duty of care to Reeves. Specifically, Dr. Alpern testified that Peterson breached his duty of care by failing to perform a proper suicide risk assessment on Reeves prior to her being discharged despite being aware that she had recently attempted to jump from her balcony into an empty swimming pool, had sent her children to live elsewhere, gave away all her clients at her place of employment, had repeatedly expressed guilt for not taking care of her deceased mother, and had experienced hallucinations in which voices told her that she needed to burn in hell. Indeed, Dr. Alpern testified that such behavior put Reeves at a high risk of suicide "that even a second year medical student would recognize." Dr. Alpern further testified that Peterson breached his duty of care by failing to stabilize Reeves in a proper medication regimen despite being cognizant of the fact that her continuing psychotic behavior and hallucinations indicated that her current medication regimen was ineffective. Importantly, Dr. Alpern also testified that Peterson breached his duty of care by not being available for consultation on the day that his patient Reeves was discharged, or at the very least, by not arranging for another psychiatrist to be available, if he was not, to evaluate Reeves on the day of her discharge. Finally, Dr. Alpern concluded that Peterson's numerous breaches of his duty of care resulted in the foreseeable harm of Reeves attempting suicide.

Construed against Peterson, the evidence and inferences drawn therefrom show that, when she was discharged from Horizons,

---

[5] *Purcell v. Breese*, 250 Ga. App. 472, 475 (1) (552 SE2d 865) (2001).

Reeves was at a high risk for committing suicide. Furthermore, the evidence shows that Peterson breached his duty of care owed to Reeves by failing to perform a proper suicide risk assessment, failing to stabilize her in a proper medication regimen, and failing to be available for consultation, or arrange for another psychiatrist to be available, on the day that Reeves was discharged. These breaches of his duty of care created a reasonable apprehension of harm sufficient to withstand summary judgment.[6]

Relying on *Bradley Center v. Wessner*,[7] Peterson argues that a psychiatrist cannot be held liable for a patient who commits or attempts to commit suicide if the psychiatrist had no physical control over the patient at the time of the incident. In *Bradley Center*, our Supreme Court carved out a narrow exception to the general rule requiring privity between a plaintiff and a physician in a medical-malpractice action by holding that

> where the course of treatment of a mental patient involves an exercise of "control" over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient.[8]

However, this Court has previously rejected an attempt to apply *Bradley Center* in a context similar to this case and with good reason.[9] In essence, *Bradley Center* marked an expansion of a physician's duty of care, albeit a very narrow one, by holding that such a duty extended to third parties injured by a patient whom the physician knew to be dangerous and over whom the physician exercised control. I therefore cannot agree with Peterson that the opinion also simultaneously limits the duty of care owed by a physician to his own most mentally troubled patients.

---

[6] *See id.* (holding that summary judgment was not warranted given some evidence that plaintiff's son's suicide was proximately caused by defendant's failure to evaluate him prior to releasing him from hospitalization); *Brandvain*, 188 Ga. App. at 116 (3) (b) (holding that if the intervening act of suicide "is a reasonably foreseeable consequence of the defendant's negligent conduct, the legal, causal connection between that conduct and injury is not broken" (punctuation omitted)).

[7] 250 Ga. 199 (296 SE2d 693) (1982).

[8] *Id.* at 201 (punctuation omitted).

[9] *See Purcell*, 250 Ga. App. at 476 (3) (holding that a physician had a duty to prevent harm to mental patient even though patient was not under physician's control at time patient committed suicide).

Accordingly, I concur with the majority that the trial court did not err in denying Peterson's motion for summary judgment but do so for reasons slightly different than those expressed in the majority's opinion.

I am authorized to state that Judge Boggs joins in this opinion.

MIKELL, Presiding Judge, dissenting.

I respectfully dissent. As Judge Andrews explains in his dissent, a plaintiff in a case such as this must prove (1) a legal duty, (2) a breach of that duty, i.e., negligence, (3) a "legally attributable causal connection" between the breach and the resulting injury, and (4) loss or damage as a result of the breach of the duty. Analysis of all lawsuits alleging negligence, and especially analysis of psychiatric malpractice cases, would be easier and more just if, when discussing item (3) above, we carefully distinguish between cause-in-fact and proximate cause.[10]

As explained by our Supreme Court in a scholarly opinion,

> a holding that a defendant's conduct is not the proximate cause of the plaintiff's injury does not constitute a determination that the defendant's conduct is not a cause in fact of the plaintiff's injury, but rather is in the nature of a policy decision by the court that, for a variety of reasons . . . , the defendant's conduct and the plaintiff's injury are too remote for the law to countenance a recovery.[11]

The scattershot affidavit of Dr. Reid, supplemented and modified by his deposition and that of Dr. Alpern, asserts that Dr. Peterson breached his professional duty of care in several ways. For example, Dr. Alpern asserts negligence by Dr. Peterson in not ordering the involuntary commitment of Mrs. Reeves, or not assessing her properly, or not being present when she was discharged from Horizons.

Of course, a physician owes a duty to his or her patient, indeed, a high duty. But he is not an insurer of the patient's health in all circumstances.

As argued in Judge Andrews's dissent, the circumstances in which a duty exists is a matter of law, not an issue of fact for a jury.

---

[10] See generally C. Mikell, Jury Instructions and Proximate Cause: An Uncertain Trumpet in Georgia, 27 Ga. St. Bar J. 60 (1990); W. Prosser, The Law of Torts, 244 et seq. (4th Ed. 1971); L. Green, Causal Relationship in Negligence Law, 60 Mich. L. Rev. 543 (1962).

[11] *McAuley v. Wills*, 251 Ga. 3, 7 (5) (303 SE2d 258) (1983), cited with approval in *Atlanta Obstetrics &c. v. Coleman*, 260 Ga. 569 (398 SE2d 16) (1990). But see Justice Weltner's special concurrence in *Coleman*, supra at 574 (4) (b) ("*McAuley v. Wills* . . . should be disapproved").

Where the General Assembly has spoken about duty, our task is merely ministerial. But when statutes are silent on the issue, we must nonetheless, like all common law judges, decide the dispute in front of us. Doing so may oblige us to say whether a duty exists or not in the circumstances presented. And our decision is precedent until and unless changed by the representatives of the people.[12]

I would be reluctant to create, or, to use a less argumentative term, to ratify, several of the duties argued for in the majority and specially concurring opinions. Those opinions and the plaintiff's experts cite as negligent Peterson's failure on August 26, 2005, to perform a "suicide or self-injury assessment" and an "adequate psychiatric assessment." We are not informed as to the time required for these assessments, and hence we do not know how much time would be added to the usual time spent by a psychiatrist with a hospitalized patient with whom he is already familiar. Dr. Peterson did not know on August 26, 2005, that he would not see Mrs. Reeves again at Horizons. Imposing a duty on a psychiatrist to prevent self-harm by a patient five days after the physician last sees her by means of administering these additional assessments would mean that every time a psychiatrist sees any patient with a history of suicidal attempts or thoughts, he must again administer those assessments. Every psychiatrist-patient encounter might be the last encounter before the five-day event.

Similarly, I would not create nor find that Georgia law already implies a duty incumbent on a psychiatrist to prevent a patient from harming herself two days after discharge by being available for consultation at discharge or having another psychiatrist be available. Having a psychiatrist be available for consultation would obviously increase the costs of community mental health facilities such as Horizons, or the cost to the patient's insurance company, if any. More importantly, it would make the psychiatrist unavailable to other patients while he was doing discharge consultations. Such involuntary rearrangements of the practice of the profession of psychiatry would be better left to a more-fully informed legislature.

One allegation of a plaintiff's expert might invoke a duty which does already exist. Dr. Alpern asserted that Dr. Peterson breached a duty of care by "failing to stabilize Reeves in a proper medication regimen." The implication is that this failure breached a duty to prevent a patient from harming herself five days later. Dr. Peterson's

---

[12] Or overruled by the Supreme Court of Georgia. The legislature can make an informed decision after committees hear from the concerned profession, from consumer advocates, etc. Our decisions could perhaps be called uninformed. We have only the information furnished us by the parties.

notes of the August 26 visit say "meds will take a while." Whether we find Dr. Alpern's testimony plausible is, of course, not relevant to our decision. Unlike the alleged duty to do things he did not do, e.g., be available for a discharge consultation, we know that Dr. Peterson did attempt to adjust Reeves's medications. Whether any medication would prevent attempted suicide five days later is a dispute among experts.

Taking Alpern's testimony as correct, as we must, Peterson's alleged failure would be a cause-in-fact of Mrs. Reeves's injuries. Georgia uses the conservative "but for" test to determine cause-in-fact. Under that analysis, the horrific injuries of the plaintiff would not have occurred five days later but for the negligence of the defendant and, of course, the negligence of others.[13]

But was the alleged negligence the proximate cause? Proximate cause is a policy decision, to be made by the jury except in plain cases, as to whether it is reasonable to impose liability for resulting injury, injury clearly "caused," by the defendant, when the connection between the negligence and the injury is attenuated.[14] Here, the injury may have been foreseeable, but it occurred five days later, and Peterson did not know that Reeves would leave Horizons in the interval. Under those circumstances, I would find that Peterson's negligence was not the proximate cause of the injuries.

I would reverse.

ANDREWS, Judge, dissenting.

In cases involving whether a doctor may be held liable for a patient's injury to a third person, Georgia law requires that the doctor have control over the patient before liability may be imposed. See *Bradley Center v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982); *Gilhuly v. Dockery*, 273 Ga. App. 418, 419 (615 SE2d 237) (2005); *Bruscato v. Gwinnett-Rockdale-Newton Community Svc. Bd.*, 290 Ga. App. 638 (660 SE2d 440) (2008). In cases involving whether a doctor

---

[13] *King v. Zakaria*, 280 Ga. App. 570, 576 (4) (b) (634 SE2d 444) (2006) (in medical malpractice action, plaintiff must show that purported violation was both cause-in-fact and proximate cause of injury, which would not have occurred but for violation); see also *Black v. Ga. Southern & Fla. R. Co.*, 202 Ga. App. 805, 807 (1) (415 SE2d 705) (1992) (malfunctioning signal may have been cause-in-fact of accident under theory that but for conditions created by malfunction, accident would not have occurred, but this does not mean railway's negligence was proximate cause of accident as there may have been intervening acts of third parties). See generally *Gen. Motors Corp. v. Davis*, 141 Ga. App. 495, 496 (1) (233 SE2d 825) (1977).

[14] *McAuley*, supra. The controversial decision in *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339 (162 NE 99) (1928), can be explained only as a finding that there was no proximate cause (or that the guards were not negligent in the first place). Clearly, Mrs. Palsgraf was within the "ambit" of those to whom a duty was owed. She had already bought a ticket, so she was a passenger. The railroad was a common carrier and owed her a duty of extraordinary care.

may be liable for patients' injuries to themselves, we have held that the doctor may be held liable where the patient is hospitalized at the time of the suicide or injury. See *Brandvain v. Ridgeview Institute,* 188 Ga. App. 106, 112 (372 SE2d 265) (1988) (finding a duty to the extent possible under reasonable medical practice to prevent suicide of a hospitalized patient). We have never held that a doctor may be liable for failing to involuntarily commit someone or failing to prevent a suicide where the patient was not under the doctor's control.

Because the existence of a legal duty in a negligence action is a question of law for the court, *City of Rome v. Jordan,* 263 Ga. 26, 27 (1) (426 SE2d 861) (1993), and because the majority provides no authority for creating a legal duty of the psychiatrist in this case,[15] and because of the numerous reasons set forth below which would militate against doing so, I respectfully dissent.

The undisputed facts in the record show that Reeves had a lengthy psychiatric history dating from at least 2001. Peterson was a psychiatrist who worked only two days a week at Horizons, which housed only voluntary patients, not patients who have been involuntarily committed.

On August 7, 2005, following a suicide attempt, Reeves was involuntarily committed to Northwest Georgia Regional Hospital. On August 15, 2005, she was discharged to Horizons. Her discharge papers stated that her condition had improved and she no longer had thoughts about wanting to hurt herself.[16]

On August 17, 2005, Reeves requested that she be discharged from Horizons. She returned for inpatient care on August 23, 2005, and Peterson examined her on August 26, 2005. Peterson noted that Reeves was psychotic and that her "meds will take a while." That was the last time Peterson saw Reeves. Three days later, Reeves again asked to be discharged from Horizons. Peterson was not working at Horizons on August 29, and he was not consulted about Reeves's discharge. Reeves was nonetheless discharged. She attended a group therapy session at Horizons on August 30, 2005, but she did not see Peterson. The next day, Reeves attempted suicide.

---

[15] The majority's attempt to characterize its holding as not stating that Peterson had a duty to involuntarily commit Reeves or a duty to prevent her suicide attempt fails, because that is what the complaint alleges that Peterson failed to do; and, that is also the effect of the majority's conclusion that Reeves has raised an issue of fact as to whether Peterson's treatment fell below the standard of care in not involuntarily committing her and in not preventing her suicide attempt.

[16] The discharging doctor and Northwest Georgia Regional Hospital have settled with Reeves and are no longer in the case.

The basis for Reeves's complaint is that Peterson failed to properly assess her when she saw him on August 26. But it is undisputed that, at that time, Reeves was a voluntary in-patient being treated until her medications could take effect.[17]

1. In order to sustain this cause of action, Reeves must prove: (1) a legal duty; (2) a breach of this duty; (3) a legally attributable causal connection between the breach and the resulting injury; and (4) loss or damage as a result of the alleged breach of the legal duty. See *Bradley Center v. Wessner*, supra. Under the circumstances of this case, I fail to see how Reeves can establish proximate cause. Reeves attempted suicide after she voluntarily left Horizons. Peterson did not discharge Reeves from the facility, and he was not consulted prior to her discharge. Notably both of plaintiff's experts refused to state that when Peterson saw Reeves on August 26, his treatment fell below the standard of care because he did not anticipate that she might attempt suicide and did not involuntarily commit her. Dr. Alpern was asked: "Do you agree or disagree that . . . on August 26th Ms. Reeves was not a danger to herself or others?" Answer: "I have no way of knowing." Dr. Reid was asked: "Was it below the standard of care for a physician not to try to commit her on August 26, 2005?" Answer:

> The short answer is no. . . . What was required was a good evaluation, including adequate risk assessment and then adequate consideration of what to do to both protect her and help her. I don't believe I can come to the conclusion based on what's in the record, that the standard required someone to put her in the hospital.

"It is clear that a plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause plaintiff harm." *Miranda v. Fulton DeKalb Hosp. Auth.*, 284 Ga. App. 203, 206 (644 SE2d 164) (2007), quoting *Zwiren v. Thompson*, 276 Ga. 498, 502-503 (578 SE2d 862) (2003) (a medical expert's statement of proximate cause as being merely possible, as opposed to reasonably probable, is insufficient to establish liability). Thus, Reeves must submit some evidence that Peterson's negligence proximately caused her attempted suicide and without that negligence, the attempted suicide would not

---

[17] Reeves was discharged from Horizons by Beverly Chapman. Reeves has already settled her case against Chapman and Horizons.

have occurred. See *Miranda*, supra at 208 (no proximate cause as a matter of law where hospital did not release patient who escaped restraints and left without permission); compare *Purcell v. Breese*, 250 Ga. App. 472, 475 (1) (552 SE2d 865) (2001) (question of fact existed as to negligence where doctor was *consulted* and *authorized release* of suicidal patient from facility without talking to patient or reviewing most recent records).

2. In Division 2, the majority rejects Peterson's contention that he had no duty to prevent Reeves from attempting suicide in this instance because he had no control over her at the time of the attempted suicide. The majority cites *Purcell*, supra, to support this holding, but *Purcell* cannot do so. In that case, a teenager was released from the hospital psychiatric unit at his mother's request. Before releasing him, a call was made to Purcell, his treating psychiatrist, who authorized the discharge. Id. at 473-474. Here, it is undisputed that Peterson was never consulted about Reeves's discharge and therefore had no opportunity to consider whether she should be discharged or involuntarily committed.

The crux of Peterson's argument on appeal is that he cannot be held liable for the attempted suicide of a patient who was not under his control. The other case cited by the majority, *Brandvain v. Ridgeview Institute*, supra, concerns the duty to prevent the suicide of a *hospitalized* patient, id. at 112, and therefore is not analogous because the patient was under the control of the healthcare provider.

More persuasive is *Ermutlu v. McCorkle*, 203 Ga. App. 335, 336 (1) (416 SE2d 792) (1992), which held that for a physician to be under a special relationship of control of such person so that liability may attach for failure to exercise ordinary care to protect others from such mental patient, a two-part test must be satisfied: "(1) the physician must have control over the mental patient; and (2) the physician must have known or reasonably should have known that the patient was likely to cause bodily harm to others." Id. Although *Ermutlu* is a case in which the patient harmed a third person, the reasoning should also apply in this case. As stated, the majority has cited no authority for making a different standard applicable in cases where the patient is a danger to herself.

3. In Division 3, the majority addresses Peterson's contention that he was under no duty to involuntarily commit Reeves. In support of its holding that failure to involuntarily commit Reeves fell below the applicable standard of care, the majority again relies on *Brandvain*, an in-patient case where the patient committed suicide while at

Ridgeview Institute.[18] That is not the issue before us. Further, we note again that neither of Reeves's experts could state that failure to hospitalize Reeves was a breach of the applicable standard of care.

4. In Peterson's last enumeration of error, he contends that imposing a duty to involuntarily commit patients violates the purpose of OCGA § 37-3-161. That Code section provides:

> It is the policy of the state that the least restrictive alternative placement be secured for every patient at every stage of his medical treatment and care. It shall be the duty of the facility to assist the patient in securing placement in noninstitutional community facilities and programs.

Peterson points out that the "least restrictive alternative placement" is designed to prevent a plethora of patients from being improperly committed to facilities with possible tragic consequences. He argues that it is recognized in the profession that suicides are virtually impossible to predict, and that involuntarily committing patients could lead to more suicides and will expose doctors to an increased risk of liability in suits for false imprisonment. See *Krachman v. Ridgeview Institute*, 301 Ga. App. 361, 365 (687 SE2d 627) (2009) (material issues of fact exist as to claim of false imprisonment by involuntarily committed patient).

Finally, Peterson correctly points out that Georgia's involuntary commitment statute does not create an affirmative duty to involuntarily commit a patient, providing only:

> Any physician within this state *may* execute a certificate stating that he has personally examined a person within the preceding 48 hours and found that, based upon observations set forth in the certificate, the person appears to be a mentally ill person requiring involuntary treatment. . . .

(Emphasis supplied.) OCGA § 37-3-41 (a).

Thus, for any and all of the above reasons, the trial court erred in not granting summary judgment to Peterson on the legal duty of care. Accordingly, this case must be reversed.

---

[18] The majority also cites *Misfeldt v. Hosp. Auth. &c. of Marietta*, 101 Ga. App. 579 (115 SE2d 244) (1960), another case in which a patient was injured while hospitalized and under the doctor's control.

388

*Lawrence A. Stagg*, for appellant.
*Ragland & Jones, Evan W. Jones*, for appellees.